**In re: Involuntary TERMINATION OF C.W.S.M. and K.A.L.M.-S., Appellee.**

**Appeal of: C.J.S., Appellant.**

Superior Court of Pennsylvania.

Argued May 23, 2003.
Filed Dec. 9, 2003.

---

**5.** At the time of the Order terminating parental rights, the children had been in foster placement for at least 3½ years.

Henry R. Newtown, Jr., Easton, for appellant.

Sara J. Hogan, Bethlehem, for appellees.

Daniel G. Spengler, Easton, for Northampton County Children and Youth Services, participating party.

Before: TODD, GRACI, and TAMILIA, JJ.

TODD, J.

¶ 1 C.J.S. ("Father") appeals the July 25, 2002 Order of the Northampton County Court of Common Pleas which terminated his parental rights to his son, C.W.S.M., born October 23, 1994, and daughter, K.A.L.M.-S., born January 29, 1996.[1] Upon review, we are constrained to reverse and remand.

¶ 2 Northampton County Department of Human Services, Children, Youth and Families Division ("CYF") first became involved with Father, C.W.S.M., and C.W.S.M.'s mother D.A.M. ("Mother") in December 1994, following allegations of chemical dependency of Father, inappropriate discipline with a leather strap of the children's older sibling, B.M., who is not subject to the instant petition, and C.W.S.M.'s failure to thrive. (N.T. Termination Hearing, 3/12/02, at 25–26.) In January 1995, CYF engaged the services of the Visiting Nurse Association ("VNA") to educate Mother on parenting skills and monitor C.W.S.M.'s weight. (*Id.* at 27–28.) B.M. was referred to KidsPeace Afternoon Treatment Program. (*Id.* at 26–27.) However, in February 1995, C.W.S.M. was hospitalized due to his low weight. (*Id.* at 28.) While hospitalized, C.W.S.M. gained weight; however, after he was released from the hospital with a prescription for an intensive feeding program, C.W.S.M. began to lose weight and was removed from the family home on February 17, 1995. (*Id.*)

¶ 3 After C.W.S.M. was removed from the home, Mother was offered parenting classes through the Program for Women and Children. (*Id.* at 29.) Mother also underwent a psychological evaluation by Dr. Henry Gursky, who recommended continued parenting skills training, random urine screens, and individual counseling. (*Id.*) Mother also was referred to the Housing Authority since the family was at risk of being evicted. (*Id.* at 28.) Mother refused to attend the parenting classes through the Program for Women and Children, but she did attend 7 of 22 sessions of the KidsPeace parenting program. (*Id.* at 29.) Mother stopped attending the program, however, in May 1995. Mother also refused to submit to the random urine screens and she failed to complete the necessary Housing Authority forms to ob-

---

1. The children's mother, D.A.M., has filed a separate appeal to the trial court's order, which is pending at docket number 3393 EDA 2002. The children are represented by counsel who has submitted a brief on their behalf arguing that the trial court's termination order was proper and should be affirmed.

tain housing for the family. (*Id.*) As a result, Mother subsequently was referred to the Valley Youth House housing program. (*Id.*)

¶ 4 Father was referred to an inpatient drug treatment program at Valley Forge Medical Center, which he completed at the end of March 1995. (*Id.* at 29–30.) Father was scheduled to attend the Lehigh Valley Addictions Treatment Service ("LVATS") aftercare program as well as a parenting program, but failed to attend either program due to alleged conflicts with his employment. (*Id.* at 30.)

¶ 5 In May 1995, Mother and Father were granted visitation with C.W.S.M. in Mother's home under the supervision of the VNA. (*Id.* at 30–31.) Mother was referred to Al–Anon or Nar–Anon, but did not attend because she was "too busy with her other requirements." (*Id.* at 31.) She did attend a spousal support group at LVATS. (*Id.*) Father attended weekly outpatient counseling, but failed to attend his 12–step meetings. (*Id.*) In May 1995, Mother was advised by CYF that C.W.S.M. could return home if she complied with the service recommendations during the next two weeks and if Father was not living in the home. (*Id.* at 32.) Father moved to an upstairs apartment; however, Mother stopped attending the KidsPeace parenting program, told the CYF caseworker that the court could not keep Father from visiting with C.W.S.M., and missed several visits with C.W.S.M. as a result of her failure to allow the VNA nurse into her home. (*Id.* at 33–35.) As a result of Mother's noncompliance, C.W.S.M. did not return home, and on May 12, 1995, was adjudicated dependent.

¶ 6 Following the birth of K.A.L.M.-S. on January 29, 1996, Mother and Father obtained new housing and complied with the court-ordered services, and C.W.S.M. was returned home on July 18, 1996. (*Id.*

at 39.) The family continued to experience difficulties, however. Father was incarcerated in January 1997 due to failure to pay child support. (*Id.* at 40.) Mother experienced financial difficulties, and the utility companies threatened to shut off her service. (*Id.* at 40.) In June 1997, B.M. was removed from the home after Mother admitted to throwing a bottle at him, giving him a black eye. (*Id.* at 42–43.) Between June and October 1997, Mother was referred to Valley Youth House, a family protection program, for outpatient counseling and psychiatric care, but refused the initial intake appointment, and then missed her first appointment and refused to reschedule. (*Id.* at 45.)

¶ 7 During the summer of 1997, Father called CYF several times to express concern regarding the children's safety since B.M., who had acted as a caretaker of the younger children, had been removed from the house. (*Id.* at 45–56.) In November 1997, the police were summoned to the family home on two separate occasions as a result of domestic disputes. (*Id.* at 50.) On December 18, 1997, both C.W.S.M. and K.A.L.M.-S. were adjudicated dependent, but placement was suspended and the children were permitted to remain with Mother provided she cooperate with a program of protective services. (*Id.* at 51.) Mother was ordered to undergo outpatient counseling and psychiatric care, cooperate with casework services, cooperate in the provision of medical services for the children, undergo family budget counseling, and take the children to daycare, which was paid for by CYF, at least twice a week. (*Id.* at 51, 93.) Father was ordered to cooperate with the Innovations and/or Intensive Outpatient Treatment Alternatives drug treatment programs, and to undergo random urine testing. (*Id.* at 48, 93.)

¶ 8 Father failed to comply with the requirements, was terminated from the In-

novations program due to poor attendance, and tested positive for amphetamines and cannabinoids in January 1998. (*Id.* at 53.) On several occasions, Father refused to submit to drug screens. Mother initially complied with the ordered services, but in January 1998 stopped taking the children to daycare, began screaming at the caseworker when the caseworker visited the home, and refused to provide an address when she moved to Allentown. (*Id.* at 94–95.) In addition, in January 1998, C.W.S.M. appeared at day care with a severe burn on his buttocks, which occurred while in Mother's care, and an investigation by CYF resulted in a finding that there was a lack of proper parental supervision. (*Id.* at 18–19.) On January 13, 1998, CYF filed a petition to revoke the suspended placement; however, the petition was withdrawn after Mother came into compliance. (*Id.* at 94–95.)

¶ 9 In March 1998, Mother again stopped taking the children to daycare and refused to work with her counselor. (*Id.* at 96–97.) Mother also permitted Father to see the children, despite a court order preventing Father from visiting with the children unless he complied with his court-ordered drug counseling and drug screening. (*Id.* at 98–99.) As a result of Mother's and Father's noncompliance, in December 1998, the children were ordered to be placed in foster care. (*Id.* at 100.) Mother and Father appealed, however, and the placement did not occur. (*Id.*)

¶ 10 In February 1999, Lehigh County Children and Youth conducted an abuse investigation with respect to K.A.C.M.-S. (*Id.* at 133–34.) The allegations of abuse ultimately were deemed unfounded; however, the children were deemed at risk and placed in the custody of CYF. (*Id.*) The children have been in foster care since that time.

¶ 11 Mother began counseling with Dr. Robert Lewis in January 1999 to address her anger management issues. (*Id.* at 135, 141.) Since that time, Father completed three of twelve random urine screens. (*Id.* at 135.) Father also began outpatient counseling at St. Luke's Treatment Center on April 16, 1999, but attended only three sessions before he was discharged on May 28, 1999. (*Id.* at 135.) Mother and Father each attended six of eight bi-weekly visits with the children during the first half of 1999. (*Id.* at 136.) Mother was ordered by the court to participate in parenting classes, address budgeting issues, and undergo a neurological and psychiatric evaluation. (N.T. Termination Hearing, 3/13/02, at 154.) The neurological assessment took place at the end of December 1999. (*Id.* at 156.)

¶ 12 Between November 1999 and March 2000, Father's attendance at drug counseling was poor, and he missed numerous urine screens between March and June 2000. (*Id.* at 159–160.) On June 21, 2000, Father was charged with harassment as a result of an assault against Mother. (*Id.* at 162.) On July 5, 2000, Father tested positive for cocaine, and he was discharged from the SLATS program due to his unwillingness to follow therapeutic advice. (*Id.* at 160, 164.)

¶ 13 On September 25, 2001, CYF filed a petition to terminate Mother's and Father's parental rights to the children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). Following a four-day non-jury trial, trial court granted CYF's petition and terminated Mother's and Father's parental rights to the children on the basis of subsections 2511(a)(1), (2), (5) and (8). This timely appeal followed.

¶ 14 In this appeal, Father presents the following questions for our consideration:

1. Did the Trial Court err in finding that termination of parental rights was in the children's best interests?
2. Did the Trial Court err in finding that the Appellant failed to perform parental duties for a period of six (6) months prior to the filing of the Termination Petition?
3. Did the Trial Court err in finding that the Appellant has not taken the appropriate steps [in] order to remedy the circumstances that led to the removal of the children?

(Appellant's Brief at 2.)

¶ 15 When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. *See In re K.C.W.*, 456 Pa.Super. 1, 9, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. *Id.* Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. *See In re Child M.*, 452 Pa.Super. 230, 245, 681 A.2d 793, 800 (1996).

¶ 16 In the present case, the trial court terminated Father's parental rights pursuant to subsections (a)(1), (2), (5) and (8) of 23 Pa.C.S.A. § 2511, which provide:

### § 2511. Grounds for involuntary termination

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The

rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).

■ ¶ 17 In support of his argument that the trial court erred in terminating his parental rights, Father contends that CYF failed to meet its burden of proving by clear and convincing evidence that termination of his parental rights would best serve the interests of the children. Specifically, Father argues that the record is devoid of evidence to support a conclusion that termination of his parental rights is in the children's best interests, that the record is silent as to the effect termination would have on the children, and that "[t]he only inquiry regarding the children is about how they are doing in their current foster care placement." (Appellant's Brief at 17.) We are constrained to agree with Father's argument.

¶ 18 Section 2511(a)(1), for example, provides that parental rights may be terminated if the parent has demonstrated a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. 23 Pa.C.S.A. § 2511(a)(1). However, once either of these factors has been established,

> the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect

of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II,* 550 Pa. 595, 602, 708 A.2d 88, 92 (1998) (citation omitted). Similarly, this Court recognized in *In re Adoption of A.C.H.,* 803 A.2d 224 (Pa.Super.2002), that the question of whether termination would best serve the needs and welfare of the child is not a mere formality flowing from the existence of the other required elements under Section 2511(a)(5), but instead is a discrete consideration. *Id.* at 229 (citation omitted).

¶ 19 Furthermore, our Supreme Court has held that where there is a lack of evidence as to the effect termination of parental rights will have on the child, there is not competent evidence to allow the trial court to make a proper determination under Section 2511(b). *Matter of Adoption of Charles E.D.M., II,* 550 Pa. at 604, 708 A.2d at 92–93; *see also In re E.M.,* 533 Pa. 115, 620 A.2d 481 (1993). In *In re E.M.,* a case involving an action to terminate the parental rights of a mentally retarded mother, the Court held that although there was evidence that the mother was unable to provide proper care for her children, her parental rights could not be terminated absent a consideration of the emotional bonds she had with her children:

> It is clearly conceivable that a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences. This is true regardless of whether adoption is imminent. To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists ... is not proper.

*Id.* at 123, 620 A.2d at 485.

¶ 20 Indeed, in *In re Adoption of A.C.H., supra,* this Court reversed the trial court's

order terminating a mother's parental rights on the basis that the trial court, which referenced needs and welfare of the child in a conclusory fashion, failed to consider evidence of the emotional bonds between mother and child, or the effect termination would have on the child. In an opinion by our esteemed colleague, the Honorable John G. Brosky, we stated:

> As our distinguished Court has so aptly noted, "[w]e cannot underestimate the importance of a child's relationship with his or her biological parents." *Adoption of Charles E.D.M., supra,* at 93. Furthermore, we are mindful of the fact that the continuity of relationships is important to a child, and we agree that severance of close parental ties through termination of parental rights can be extremely painful. *In re C.S.,* 761 A.2d 1197 (Pa.Super.2000). With these considerations in mind, we are constrained to reverse and remand this matter to give the parties an opportunity to present further testimony regarding the emotional bonds between mother and daughter, and the effect a termination of parental rights would have on A.C.H. Subject to such hearing, the trial court shall conduct an analysis regarding this issue as well as all other factors bearing upon the termination of S.H.'s parental rights. *See E.M., supra.*

803 A.2d at 229–30.

¶ 21 Despite the troubled history in this family, our review of the record indicates that there is at least some type of bond between Father and the children. The evidence indicates that Mother and Father have been consistent in their visitation with the children, that Mother and Father interact with the children and supervise them appropriately. (N.T. Termination Hearing, 3/14/02, at 228, 239.) One CYF caseworker testified that "[t]here was good interaction between [Mother and Father] and the children." (*Id.* at 282.) Indeed, the children run to Father when they see him. (*Id.* at 225.) Furthermore, the children have expressed in the past their desire to return home. (*Id.* at 243.) Although a CYS caseworker testified that the children haven't expressed such a desire in "quite a while", the caseworker acknowledged that there was one recent occasion where C.W.S.M. told Mother that his foster mother said it was up to the judge whether he would return home. (*Id.* at 243.)

¶ 22 In its opinion written in support of its order terminating Father's rights to C.W.S.M. and K.A.L.M.-S., the trial court evaluated the needs and welfare of the children as follows:

> [C.W.S.M. and K.A.L.M.-S.] were developmentally delayed when first removed from the care of their parents. Since entering their foster home, they have made significant strides and are now receiving above average grades in school. They are content in their new home and have established a positive bond with their foster family. There have been no reports of overt physical abuse or malnourishment in their foster home.

> We find that the needs and welfare of [the children] are best served by the termination of mother and father's parental rights.

(Trial Court Opinion, 7/25/02, at 16–17.) Notably absent, however, from the trial court's analysis is a consideration of the bonds that may or may not exist between Father and the children, and the likely effect termination of Father's parental rights will have on the children. Moreover, our review of the record reveals a lack of evidence as to the likely effect termination of Father's parental rights will have on the children. Thus, in accordance with the cases discussed above, we are

constrained to reverse the trial court's order terminating Father's parental rights to C.W.S.M. and K.A.L.M.-S, and remand the matter to allow the parties to present testimony regarding the emotional bonds between Father and the children, and the effect a termination of parental rights will have on the children, after which the trial court should conduct an analysis regarding this issue as well as all other factors bearing upon the termination of Father's parental rights.[2]

¶ 23 Order **REVERSED** and case **REMANDED** for proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED**.

¶ 24 Judge TAMILIA files a Dissenting Opinion.

TAMILIA, J., Dissenting.

¶ 1 Having carefully reviewed the majority memorandums in the matters of In Re: Involuntary Termination C.W.W.M. and K.A.L.M.-S., Appeal of D.A.M. (mother), 3393 EDA 2002 and In Re: Involuntary Termination C.W.W.M. and K.A.L.M.-S., Appeal of C.J.S. (father), 3394 EDA 2002, I respectfully dissent to the decision to reverse the Orders terminating appellants' parental rights and remand to allow the parents to present testimony regarding the emotional bonds between each parent and their children and also, the effect the termination of parental rights will have on the children.

¶ 2 A review of the record indicates the evidence presented by CYS was clear and convincing so as to support the trial court's conclusion that termination of parental

rights is in the children's best interests. The parents demonstrated a repeated failure to comply with the treatment and educational opportunities suggested and offered by CYS or ordered by the court, and their overt failure and/or refusal to cooperate with CYS in order to regain custody of their children supports the trial court's finding that termination of parental rights is in the best interest of the children as they are thriving both mentally and physically in their foster environment.

¶ 3 The majority has reversed the Orders of the trial court and remands the matters for the court to make an analysis of the presence of bonding or lack of it between the father and the children, mother and the children and the likely effect termination of each parent's parental rights will have on the children.

¶ 4 The factual summary of this case is as follows. C.J.S., father, and D.A.M., mother, appeal the July 25, 2002 respective Orders terminating each parents rights to the children, son, C.W.S.M., D.O.B. 10/23/94 and daughter, K.A.L.M.-S., D.O.B. 1/29/96.[3] The children are represented by counsel who supports termination.

¶ 5 Northampton CYS became initially became involved with parents in December 1994 because of abusive strapping of B.M., an older son not involved here, and C.W.S.M.'s *failure to thrive.* Father's chemical dependency was a precipitating factor as were multiple referrals for failure in parenting by both parents. In February 1995, C.W.S.M. was hospitalized for low weight. After gaining weight he was released subject to an intensive feeding

---

**2.** In view of our determination, we need not address Father's two remaining issues. We note, however, that a best interest of the child analysis is required under each subsection of 23 Pa.C.S.A. § 2511 upon which the trial court grounded its termination of Father's parental rights. 23 Pa.C.S.A. § 2511(b).

**3.** While the majority has chosen to write separate opinions, I have chosen to *sua sponte* consolidate the appeals for writing purposes. The Dissenting Opinions filed in these matters are identical.

program but weight loss again resulted. This necessitated removal from his parents on February 17, 1995. Parents were directed to be involved in parenting classes, and to seek more adequate housing. Mother failed to complete Housing Authority forms necessary to obtain housing; moreover she refused parenting classes offered to her through the Program for Women and Children, instead attending seven (7) of twenty-two (22) sessions of the KidsPeace parenting program. She also refused urine testing for drugs. Father completed an inpatient drug treatment program at the end of March 1995 but failed to attend the aftercare addiction treatment program and parenting classes. CYS involved parents in several other programs including supervised visitation with C.W.S.M. but lack of progress resulted in denial of the child's return. Ultimately, on May 12, 1995, C.W.S.M. was adjudicated dependent.

¶ 6 Following the birth of K.A.L.M.-S., on January 29, 1996, parents obtained new housing; they complied with court-ordered service and C.W.S.M. was returned home on July 18, 1996. Thereafter, family problems continued which resulted in the removal of B.M. (the older child) in June 1997 due to mother's abuse. Father had called CYF several times during the summer of 1997 regarding concern over mother's neglect and in November 1997, police were summoned for two domestic disputes.

¶ 7 On December 18, 1997, both C.W.S.M. and K.A.L.M.-S. were adjudicated dependent with placement suspended and the children permitted to remain with mother provide she cooperate with services and referrals. Father was also required to participate. In January 1998, C.W.S.M. appeared at day care with severe burns on his buttocks which occurred while in mother's care. CYF filed a petition to revoke the suspended placement which was withdrawn upon mother's compliance with agency programs. In March 1998, there was further non-compliance and an Order was entered in December 1998 for placement of the children out of the home. Mother and. father appealed placement and placement did not occur.

¶ 8 In February 1999, an abuse report was filed and although unfounded, after investigation, the children were found to be at risk and placed in custody of CYF and have remained in foster care since that time. The parents were placed in multiple programs for parenting, anger management, drug rehabilitation, none of which were completed successfully. On September 25, 2001, CYF petitioned to terminate parental rights. Following a four-day hearing, termination was ordered on the basis of findings of violations of sections 23 Pa.C.S.A. §§ 2511, **Grounds for involuntary termination,** (a) **General rule** (1), (2), (5) and (8).

¶ 9 The majority would require the trial court to establish an additional element, the lack of an emotional relationship between the children and the parents, before termination would be justified. I believe this would not be possible in this case or the majority of cases where termination occurred as children continue to be attracted to their biological parents even in situations of neglect or abuse when their needs and welfare clearly mandate removal and placement for adoption. Only when the bond is unusually strong, and severance clearly would be detrimental to the children, would termination be contraindicated. I do not find that situation existing here.

¶ 10 The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding. The

bonding cannot be in one direction only—that of child to the parent—but must exhibit a bilateral relationship which emanates from the parents' willingness to learn appropriate parenting, anger management, drug rehabilitation and marital stability. It is inconceivable that a child's bonding to the parent, if it can be documented, will supervene failure to thrive, abuse reports, burned buttocks due to neglect, domestic violence reports and removal of the children into foster care due to adjudications of dependency and termination findings pursuant to four categories of the law permitting termination of parental rights (2511(a)(1), (2), (5) and (8)).

¶ 11 Although the trial court did not expressly categorize lack of bonding with the parents as a finding which addressed the needs and welfare of the children, the totality of the evidence demonstrates a lack of bonding and, in conjunction with the overwhelming evidence addressing the children's' needs and welfare which support termination, a further review of the presence or absence of bonding is unnecessary.

¶ 12 The following is an example which establishes that bonding is contraindicated and not present:

¶ 13 In January 1995, the agency became concerned with C.W.S.M.'s low weight and added services by the Visiting Nurse Association (VNA) to monitor his weight and to provide additional parenting skills education to the mother (N.T., 3/12/02). The child was hospitalized for low weight, gained weight in the hospital, and was then released on a very intensive, enriched feeding program. Notwithstanding, he again suffered significant weight loss and it was necessary for the agency to provide emergency placement for him. (N.T. at 28). This is the classic pattern of failure to thrive incident to maternal deprivation and *is the major indicator of lack of bonding between parent and child.* Thereafter, parents failed to achieve most of the goals of parenting training, drug rehabilitation and living/housing improvements (N.T. at 29). Their behavior, life style and intractability indicates there will be no bonding as these are patterns of parenting inadequacy which make bonding to the child improbable or, if it takes place, pathological.

¶ 14 The trial court made 94 findings of fact and documented supporting conclusions of law through eleven pages of discussion. In particular, findings of fact by the trial court which contraindicate parental bonding or capacity to bond are as follows.

8. Chris was hospitalized for low weight. During this hospitalization, he gained weight and was released with a prescription for a very intensive, rich feeding program.

9. Chris began losing weight after leaving the hospital and he was removed from his home and provided an emergency placement on February 17, 1995.

. . .

19. The agency informed mother that Chris could come home if she complied with services for the next two weeks and if father was not living in the home.

. . .

21. As a result of her noncompliance, Christopher was not returned home.

. . .

23. After obtaining new housing and complying with court ordered services, Chris was returned home on July 18, 1996.

. . .

34. The agency conducted an abuse investigation in January 1998 when mother was accused of physically abusing Chris. The abuse consisted of a

severe burn on Chris's buttocks received while under mother's supervision. The abuse was found to be "indicated."

(Trial Court Opinion, Freedberg, P.J., at 2–5.)

¶ 15 Between December 1997 and January 2002, there were 52 findings of fact indicating failure on the part of the parents to follow agency and court directions required to have the children reunited with them, including parent training, anger management, drug rehabilitation, visitation compliance, psychiatric treatment, drug testing and screening, daycare placement of the children, compliance with visitation restrictions—in addition there were police domestic calls, harassment and assault by husband against wife and difficulties with housing and budgeting requiring seeking help from the food bank. In general it has been established, by the findings of fact based on the testimony presented by several agency workers, psychologists, drug rehabilitation experts and family counselors, that this is a dysfunctional family with virtually no prospects of rehabilitation.

¶ 16 At finding of fact 80 of the trial court Opinion, the court states: "Father testified that he stopped attending urine screens because he was going to voluntarily relinquish his paternal rights. He stated that 'it's been going on for three years. I don't want to do it anymore.'" (Trial Court Opinion at 10.) This is a clear admission he is bonded to his drug addiction and gives it priority over his children. There can be no bonding to the children under these circumstances.

¶ 17 At findings 83, 84 and 85, the court states:

83. Initially, both children had developmental delays when they were placed in foster care. *In July 1999, it was determined that both children were developing normally.*

84. The children are comfortable and happy in their foster home. The family relationships are positive. *The children are bonding well with the foster parents.*

85. The children leave the visitation periods [with parents] without incident. There is no crying and the children do not hesitate to leave.

(Trial Court Opinion at 10; emphasis added.)

¶ 18 To document the bonding which has occurred with the foster parents and the affirmative results of that relationship, which could only face reversal if the children were reunited with the parents, who have made no significant progress in over three years, the court made the following findings of fact.

86. The children's needs are being met by the foster parents.

87. The children are content and happy in the foster parents' care.

88. The children are involved in school related activities such as soccer.

89. The children are receiving regular medical and dental checkups at their foster home.

90. Martha Doerr testified as an expert in family and couples counseling.

91. Doerr stated that couples counseling was not going to help father and mother resolve their differences.

92. *She testified that their relationship was not good for their children. The pattern of splitting up and reuniting raises children's anxiety and shakes their sense of security and stability.*

93. Chris is in first grade and Kira is in kindergarten.

94. *Their grades are above average, they have adjusted very well, and they have made many friends.*

(Trial Court Opinion at 11; emphasis added.)

¶ 19 Returning to the totality of the evidence and findings by the trial court noted above, it is beyond question the parents have not fulfilled any of the FSPs proposed in over 27 months and the children have remained in foster care during that period. There is no clear evidence that the children are bonded to the natural parents and substantial evidence of their bonding to the foster parents. Aside from one family counselor of the several involved over the years (Robert Lewis), whose credibility was discounted by the trial court, all the experts testified as to the inadequacy of the parents in their relationship with each other and their inability to resolve problems relating to drugs, parenting, finances and providing safe and healthy care for the children.

¶ 20 The progress of the children in emotional and physical development and adjustment to school and the community is primarily attributable to the stability and nurturing they have experienced in the foster home over a period of more than two years. Two major cases cited by appellants for the necessity of exploring of the effect of the child parental bond on their health and welfare are *Adoption of E.D.M.*, 550 Pa. 595, 708 A.2d 88 (1998), and *Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064 (1999). In both cases, the issues were much different than those in the present case. In those cases, termination was sought by one natural parent as to the other parent and involved extreme antagonism and denial of access to the child by one of the parents with no evidence produced to show the effect termination would have on the children. The issues in the present case are those addressed by the Adoption and Safe Families Acts[4] when the virtual life time of the children may be spent in foster care and the courts and CYS have exhausted reasonable efforts to reunite the family beyond the minimal six months required by the Adoption Act. The facts in this case are better directed to the cases which hold that a child's life, happiness and vitality simply cannot be put on hold until the parent finds it convenient to perform parental duties. *In the Matter of the Adoption of A.M.B.*, 812 A.2d 659 (Pa.Super.2002). Appellee's brief closes its argument as follows:

4. The legislative history of the Adoption and Safe Families Act provides in pertinent part as follows:

There seems to be a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents. As a result too many children are subjected to long spells of foster care or are returned to families who reabuse them.

The bipartisan group that wrote this legislation recognized the importance and essential fairness of the reasonable efforts criterion. What is needed is not a wholesale reversal of reasonable efforts or of the view that government has a responsibility to help troubled families solve the problems that lead to child abuse or neglect. Rather than abandoning the Federal policy of helping troubled families, what is needed is a measured response to allow States to adjust their statutes and practices so that in some circumstances States will be able to move more efficiently toward terminating parental rights and placing children for adoption. Thus, the Committee bill would require States to define "aggravated circumstances," such as chronic abuse, or sexual abuse, in which States are allowed to bypass the Federal reasonable efforts criteria and instead would be required to make efforts to place the child for adoption. In addition, States would be required to bypass reasonable efforts to provide services to families if the parent has another child for whom parental rights were involuntarily terminated.

Adopted by Pennsylvania Legislature, 42 Pa. § 6302, **Definition**, "Aggravated Circumstances", § 6334, **Petition, (b) Aggravated Circumstance**, § 6351, **Permanency hearing**, (9). Also, 55 Pa.Code § 3130.67(b)(9)(iii), **Placement planning.**

Christopher and Kira have been [in] a foster home for 27 months,[5] the foster parents are stable influences on their lives, the children are doing very well there. It would not be in their best interest to consign them to more years of limbo as dependent children. Having met the requirements of termination of parental rights, the needs and welfare of the children required that those parental rights be terminated.

(Appellee's brief at 26.)

¶ 21 I believe the remand directed by the majority for the trial court to explore the existence of bonding to the natural parent would be an exercise in futility and if, by chance, it was determined to be a viable possibility, would be detrimental to the needs and welfare of the children. I would affirm the Order of the trial court terminating parental rights of D.A.M. and C.J.S.

---

**5.** At the time of the Order terminating parental rights, the children had been in foster placement for at least 3½ years.