**In re Involuntary Termination of Parental Rights to K.M.C.T., M.J.T. and S.L.C.S.**

C.P. of Lehigh County, nos. A2006-0030, A2006-0031, A2006-0032.

*Valerie Cammarene,* for petitioner OCYS.
*David M. Roth,* for biological Mother.
*Teresa I. Resendez,* for Minors.

BLACK, *J.,* September 14, 2006—Before the court for disposition are (a) the petition filed by Office of Children and Youth Services (OCYS) for the involuntary termination of the parental rights of the biological mother M.L.T., to her minor children, K.M.C.T., M.J.T. and S.L.C.S., and (b) the petition of OCYS for the involuntary termination of the parental rights of the biological father J.R.B., to his minor daughter K.M.C.T. A hearing was held on these petitions on June 8 and 9, 2006. From this hearing we make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### I. *General Findings*

(1) K.M.C.T. is a female child born May 22, 1997, in Lehigh County, Pennsylvania.

(2) M.J.T. is a male child born June 12, 2000, in Lehigh County, Pennsylvania.

(3) S.L.C.S. is a female child born February 1, 1993, in Lehigh County, Pennsylvania.

(4) M.L.T. (Mother) is 32 years old, single, and the biological mother of K.M.C.T., M.J.T. and S.L.C.S.

(5) J.R.B. is 51 years old, single, and the biological father of K.M.C.T. J.R.B.'s paternity was confirmed by a paternity test.[1]

(6) The biological father of M.J.T. has only been identified as "B."[2]

(7) B. was not present for the hearing on June 8, 2006. B. was provided notice of the hearing through publication.[3]

(8) A.V.E. is the biological father of S.L.C.S.[4]

(9) A.V.E. was not present for the hearing on June 8, 2006. His last known whereabouts are in Georgia.[5]

(10) OCYS unsuccessfully attempted to serve A.V.E. in Georgia regarding the termination hearing. A.V.E. has not been present for any of the juvenile proceedings, nor has he contacted OCYS.[6]

## II. *Findings As to Mother*

(11) Mother was present for the hearing on the petition to terminate her parental rights on June 8, 2006, and was represented by legal counsel.

(12) Mother admits that on May 15 or 16, 2004, S.L.C.S. told her that she was being sexually abused by a man living in their home, C.L.W.[7] Mother allowed

---

1. Notes of Testimony 6/9/06 (N.T.), 7.
2. N.T. 8.
3. *Id.*
4. N.T. 5.
5. *Id.*
6. N.T. 6.
7. Notes of Testimony 6/8/06, 55.

C.L.W. to continue residing in the home for at least another 12 days.[8]

(13) OCYS received a referral regarding Mother on or about May 28, 2004. The referral consisted of a report of sexual abuse against S.L.C.S.[9]

(14) OCYS had previously been involved with the family for issues of hygiene and truancy.[10]

(15) On May 28, 2004, OCYS obtained emergency custody of K.M.C.T., M.J.T. and S.L.C.S. and they were placed into foster care.[11]

(16) The report of sexual abuse was given a founded status, naming C.L.W., Mother's paramour, as a perpetrator of sexual abuse with permission, and Mother as a perpetrator of sexual abuse by omission.[12]

(17) At the time OCYS received the referral C.L.W. was residing with Mother as her boyfriend.[13]

(18) A perpetrator of sexual abuse by omission means that Mother was aware that the abuse was occurring, and failed to take any steps to report the abuse or protect her child.[14]

(19) On July 9, 2004, K.M.C.T., M.J.T. and S.L.C.S. were adjudicated dependent. Mother was present at the hearing.[15]

---

8. N.T. 6/8/06, 56.
9. N.T. 9.
10. N.T. 6/8/06, 56.
11. *Id.*
12. *Id.*
13. N.T. 10.
14. *Id.*
15. N.T. 11.

(20) Mother was court-ordered to cooperate with recommendations of S.L.C.S.'s treatment provider, cooperate with criminal and child protective services investigations, insure that the children have no contact with the perpetrator, undergo an evaluation and assessment with Forensic Treatment Services and cooperate with recommendations, cooperate with OCYS, and attend biweekly supervised visits with the children.[16]

(21) The juvenile court order of July 9, 2004, for K.M.C.T. stated that[17]

"(d) On May 27, this juvenile was taken into emergency custody. At the time of the placement Mother's home was dirty and cluttered and smelled. The juvenile's hygiene upon placement was not satisfactory. And the home also smelled heavily of cigarette smoke.

"(e) . . .

"(f) Juvenile's older sister has been the victim of sexual abuse by C.L.W. C.L.W. also assaulted juvenile's older subbing [sic] while this juvenile was present."

(22) Forensic treatment services is an agency that provides treatment to sexual offenders, nonoffending parents, and victims of sexual and physical abuse.[18]

(23) In July of 2004, Mother began individual counseling at Confront.[19]

(24) On August 17, 2004, C.L.W. was arrested due to his abuse of S.L.C.S. and charged with aggravated indecent assault without consent, aggravated indecent assault forcible compulsion, aggravated indecent assault on a

16. N.T. 12.
17. Petitioner's exhibit 2; N.T. 12-13.
18. N.T. 13.
19. N.T. 6/8/06, 25.

person less than 13 years of age, aggravated indecent assault of a child, indecent assault without consent of others, indecent assault mental disease defect, indecent assault of a person less than 13 years of age, and corruption of minors.[20]

(25) On August 19, 2004, as a result of the sexual abuse, Mother was arrested and charged with endangering the welfare of a child, being S.L.C.S.[21]

(26) In September 2004, Mother began attending group therapy sessions at Confront.[22]

(27) A permanency review hearing was held on September 14, 2004. Mother was present for the hearing.[23]

(28) The September 14, 2004, court order noted that Mother was cooperating with services. At the time of the review hearing Mother had started individual counseling and nonoffending parent treatment group counseling, both through Confront.[24]

(29) Ann Friedenheim M.A., C.A.C.D., Mother's counselor at Confront submitted a report dated September 7, 2004, stating that Mother was participating in treatment.[25]

(30) At the time of the review hearing Mother continued to have supervised visitation with the children.[26]

---

20. N.T. 18-19; petitioner's exhibit 4.
21. N.T. 10.
22. N.T. 6/8/06, 25.
23. N.T. 23.
24. N.T. 24, 27.
25. N.T. 25-27.
26. N.T. 28-29.

(31) On October 12, 2004, Mother entered a plea of guilty to endangering the welfare of a child.[27]

(32) A permanency review hearing was held on March 8, 2005. The court determined that Mother was complying with services.[28] Mother was present for this hearing.

(33) Ms. Friedenheim, M.A., C.A.C.D., submitted another status report dated March 7, 2005, disclosing that Mother's attendance at therapy was excellent. Mother was doing well in individual counseling, but was struggling to adjust to group therapy.[29] In group therapy Mother had a detached relationship with the other women.[30] Mother also had requested therapy with her daughter, and family therapy sessions were therefore being instituted.[31]

(34) On March 14, 2005, C.L.W. entered a plea of guilty to indecent assault on a person less than 13 years of age, for his assault on S.L.C.S.[32]

(35) On March 21, 2005, Mother was sentenced on the charge of endangering the welfare of a child to pay the costs of prosecution and to be on probation for a period of 18 months. The conditions of probation were that she have no contact with C.L.W. and that she comply with the requirements established by OCYS.[33]

---

27. N.T. 22; petitioner's exhibit 5.
28. N.T. 34-35.
29. N.T. 32.
30. N.T. 33.
31. N.T. 34.
32. N.T. 20.
33. N.T. 22.

(36) On May 25, 2005, Mother was discharged from Confront due to nonattendance.

(37) On June 28, 2005, a permanency review hearing was held.

(38) During the review period Mother did schedule a psychological evaluation in September 2005, did attend visitation with the children, and did complete a parenting class.[34]

(39) Mother was court-ordered to attend counseling at Confront, attend visitation with the children, resolve criminal charges, comply with probation, obtain and maintain suitable housing, and cooperate with OCYS. She was also prohibited from allowing contact between C.L.W. and S.L.C.S.[35]

(40) On July 1, 2005, C.L.W. was sentenced on the charge of indecent assault to pay the cost of prosecution, undergo imprisonment in Lehigh County Prison for a period of not less than 9 months, nor more than 23 months.[36] C.L.W. was also instructed to have no contact with S.L.C.S. or with her immediate family and to engage in counseling services.[37]

(41) At the time of the hearing on Mother's petition, C.L.W. remained incarcerated.[38]

(42) In or around August 2005, Mother suffered a mental health crisis. As a result, Mother resided at the

---

34. N.T. 36-38.
35. N.T. 45-46.
36. N.T. 20.
37. N.T. 20-21.
38. N.T. 21.

Salisbury House, a mental health treatment home, until approximately September 2005.[39]

(43) A change of goal hearing was conducted on November 29, 2005. The permanency goal was changed to a dual goal of reunification and termination of parental rights.[40]

(44) Mother received notice of the change of goal hearing, but she did not attend.[41]

(45) During the review period Mother failed to consistently attend counseling at Confront. She also failed to appear for her appointment to have a psychological evaluation.[42]

(46) On November 29, 2005, Mother was ordered to attend counseling at Confront, comply with parenting classes, continue visiting the juveniles, allow no contact between the children and C.L.W., resolve all criminal charges and comply with probation, obtain and maintain stable housing, and cooperate with OCYS.[43]

(47) On February 20, 2006, Mother was discharged from treatment by Confront for lack of compliance.[44]

(48) Mother contacted OCYS by telephone on March 6, 2006. She left a message indicating who she was and that she would call back. Mother left no contact information for OCYS to reach her.[45]

---

38. N.T. 21.
39. N.T. 95.
40. N.T. 46.
41. N.T. 47.
42. N.T. 54.
43. N.T. 55.
44. N.T. 59.
45. N.T. 57.

(49) OCYS attempted to contact Mother by mailing letters to 519 North Franklin Street, 121 South Blank Street, and 1215 South Blank Street. All three letters were returned to OCYS without being delivered to Mother.[46]

(50) Mother did not successfully complete her probation due to a failure to cooperate with OCYS and a failure to maintain contact with her probation officer. By order of April 27, 2006, Mother was resentenced to six to 18 months in Lehigh County Prison.[47]

(51) On May 2, 2006, a permanency review hearing was held. Mother was present for the hearing.[48]

(52) The court summary provides that Mother was discharged from Confront for noncompliance, and she had not completed her psychological evaluation.[49]

(53) The court determined that visitation with the juveniles had become inconsistent. Mother had missed one visit in December 2005, one in February 2006, two in March 2006, and two in April 2006.[50]

(54) On May 8, 2006, Mother left a message at OCYS indicating that she was in the work release program.

(55) Ms. Dunn contacted Mother's counselor, Laura Petty, in the work release program, to establish visitation.

(56) Mother telephoned Ms. Dunn on May 11, 16, 17, 22 and 24, 2006. Mother was unable to reach Ms. Dunn

---

46. N.T. 57-58.
47. N.T. 22-23.
48. N.T. 55-56.
49. N.T. 56.
50. N.T. 56.

until May 24, at which time they discussed Mother's pretrial hearing.[51]

(57) Mother has not contacted OCYS since May 24, 2006.[52]

(58) At the time of the June 8, 2006 hearing, Mother remained in the work release facility.[53]

### III. *Findings As to J.R.B.*

(59) J. R. B. was not present on June 8, 2006, for the hearing on the petition to terminate his parental rights.

(60) OCYS provided notice to J.R.B. by publication regarding the involuntary termination hearing. He did participate in the juvenile proceedings regarding K.M.C.T. for a period of time.[54]

(61) J.R.B. currently has an outstanding warrant for his arrest.[55]

(62) J.R.B. was present at the July 9, 2004 hearing where K.M.C.T. was adjudicated dependant.[56]

(63) At the adjudication hearing J.R.B. presented himself as a placement resource for K.M.C.T. The court order reflected that J.R.B. had not cared for or had any significant contact with K.M.C.T. prior to her adjudication. J.R.B. was unable to obtain custody of K.M.C.T. because he had inadequate housing.[57]

---

51. N.T. 61-62.
52. N.T. 62.
53. N.T. 23.
54. *Id.*
55. *Id.*
56. N.T. 11.
57. N.T. 16.

(64) A permanency review hearing was held on September 14, 2004. J.R.B. was present for the hearing.[58]

(65) J.R.B.'s visits with K.M.C.T. were increased, and J.R.B. was court-ordered to have weekly supervised visits for 90 minutes. Within 45 days, the visitations were to be changed to unsupervised in the community. J.R.B. was also ordered to continue to cooperate with visiting nurses and OCYS.[59]

(66) At the time of the September 14 hearing J.R.B. was still unable to take custody of K.M.C.T. because of inadequate housing.[60]

(67) J.R.B. was present for the permanency review hearing on March 8, 2005.[61]

(68) A permanency review hearing was held on June 28, 2005. The court order permitted OCYS to place K.M.C.T. in the custody of J.R.B. upon approval of his residence.[62]

(69) J.R.B. did attend the change of goal hearing on November 29, 2005.[63]

(70) J.R.B. had not obtained custody of K.M.C.T. between the June and November hearings. J.R.B. did not have suitable housing or childcare available to him. OCYS was also concerned that J.R.B. had a second daughter already residing with him, whose mother had a history with OCYS. J.R.B. indicated that the mother

58. N.T. 23.
59. N.T. 29-30.
60. N.T. 29.
61. N.T. 34-35.
62. N.T. 44.
63. N.T. 47.

to his other child did not reside with him, but that he did utilize her as a caretaker.[64]

(71) As of the November hearing, J.R.B. continued to have visitation with K.M.C.T. The visits were occurring at his home. K.M.C.T. suffers from asthma and allergies and had reactions to J.R.B.'s cat during her visits.[65]

(72) By letter of January 13, 2006, OCYS informed J.R.B. of K.M.C.T.'s allergic and asthmatic conditions and suggested that he find another home for his cat. J.R.B. did not get rid of his cat.[66]

(73) OCYS Caseworker, Sharon Dunn, spoke with J.R.B. by telephone on February 7, 2006. During that conversation J.R.B. revealed that he had a relapse after being clean for 15 years, and was going in for a weekend of treatment.[67]

(74) J.R.B.'s last visit with K.M.C.T. occurred on March 3, 2006. At this time OCYS was informed that J.R.B. had acquired a second cat.[68]

(75) J.R.B. has not contacted OCYS since March 3, 2006.[69]

(76) On March 9, 2006, OCYS mailed a letter to J.R.B. requesting a meeting to discuss reunification services. The letter also informed J.R.B. that the visits were being moved to OCYS due to K.M.C.T.'s health issues and his inconsistency in visitation.[70]

---

64. *Id.*
65. N.T. 48.
66. *Id.*
67. N.T. 52.
68. N.T. 51.
69. N.T. 52.
70. N.T. 49, 50.

(77) A second letter was mailed to J.R.B. on March 29, 2006. The letter was not delivered and was returned to OCYS.[71]

(78) Between November 29, 2005 and May 2, 2006, J.R.B. stopped attending visits with K.M.C.T. There were 16 visits scheduled during this time period. He failed to visit with K.M.C.T. on 11 of these occasions. J.R.B.'s home was located almost across the street from K.M.C.T.'s foster family.[72]

(79) J.R.B. was not present for the permanency review hearing held on May 2, 2006.[73]

## IV. *Findings As to the Juveniles*

(80) All three children have remained in the continuous custody of OCYS since their placement on May 28, 2004.[74]

(81) S.L.C.S. has had a difficult time in foster care. She has been in six different placements since she was adjudicated dependent. Her difficulties involve stealing, aggression, poor peer interactions and self-harming behaviors.[75]

(82) On February 23, 2006, S.L.C.S. was placed at Ashley Manor, a residential treatment facility for girls. Ashley Manor specializes in treating children who have been sexually abused.[76] S.L.C.S. receives around-the-clock supervision, individual therapy, group therapy and behavioral modification.[77]

---

71. N.T. 51.
72. N.T. 50.
73. N.T. 55-56.
74. N.T. 10.
75. N.T. 63.
76. N.T. 63.
77. N.T. 66.

(83) It is anticipated that S.L.C.S. will be discharged in the fall of 2006, at which time she would be returned to her foster home.[78]

(84) It is important for S.L.C.S. to feel safe and secure in the custody of her caregivers.[79]

(85) S.L.C.S. does have an attachment to Mother, but it is not healthy. S.L.C.S. says that she loves Mother, but that it would be okay for her to be adopted. S.L.C.S. lacks an emotional bond with Mother and S.L.C.S. does not believe that Mother will protect her or nurture her.[80]

(86) S.L.C.S. is an adoptable child.[81]

(87) K.M.C.T. is in third grade and has been in her current foster home since June 3, 2004. K.M.C.T. was previously receiving specialized education services to improve her reading and math skills. She has now transferred to regular education classes, with some summer education assistance to help maintain her grade level.[82]

(88) When K.M.C.T. entered placement she had difficulty with rules and structure, temper tantrums and hygiene problems. She has made significant progress in these areas.[83]

(89) K.M.C.T. does attend weekly counseling and receives psychiatric medication monitoring through Florence Child Guidance Center.[84]

---

78. N.T. 64.
79. N.T. 66.
80. N.T. 67.
81. N.T. 84.
82. N.T. 68.
83. N.T. 68-69.
84. N.T. 69.

(90) K.M.C.T. has an unhealthy attachment to Mother. K.M.C.T. states that she loves her mother, but that she is scared by the idea of living with her.[85]

(91) M.J.T. attends kindergarten. He does well academically and behaviorally, but struggles with peer interactions. He has been verbally and physically aggressive.[86]

(92) M.J.T. receives weekly therapy and medication management through Florence Child Guidance Center.[87]

(93) M.J.T. has been in his current foster home for approximately two years.[88]

(94) M.J.T. previously had a diagnosis of reactive attachment disorder, which indicates that he does not have an attachment to Mother. Reactive attachment disorder occurs when a child does not form a healthy emotional bond with their birth parents at a young age.[89]

(95) S.L.C.S., K.M.C.T. and M.J.T. are each residing in different placements.[90]

(96) Severing the bond between Mother and the juveniles would not cause any harm to S.L.C.S., K.M.C.T. or M.J.T.[91]

---

85. N.T. 69.
86. N.T. 70.
87. N.T. 70.
88. N.T. 71.
89. N.T. 72-73.
90. N.T. 71.
91. N.T. by Lenore Wagner, 73.

## CONCLUSIONS OF LAW

### I. *Mother*

(1) For more than six months prior to the filing of this petition for involuntary termination of parental rights, and thereafter, Mother's failure to comply with court-ordered services constitutes a failure to perform parental duties sufficient to warrant the involuntary termination of her parental rights pursuant to 23 Pa.C.S. §2511(a)(1).

(2) Mother has demonstrated an unwillingness or inability to provide the juveniles with the essential parental care necessary for their physical or mental well-being, which is grounds for the involuntary termination of her parental rights pursuant to 23 Pa.C.S. §2511(a)(2).

(3) While the juveniles have been in the continuous care of OCYS since May 28, 2004, Mother has failed to address the issues that led to placement of the juveniles, thereby warranting the involuntary termination of her parental rights pursuant to 23 Pa.C.S. §2511(a)(5).

(4) Mother's failure to avail herself of the proffered services designed to address the issues that led to placement of the juveniles on May 28, 2004, constitutes grounds for the involuntary termination of her parental rights pursuant to 23 Pa.C.S. §2511(a)(8).

(5) The termination of Mother's parental rights will serve the developmental, physical and emotional needs and welfare of the juveniles. 23 Pa.C.S. §2511(b).

### II. *J.R.B.*

(1) For more than six months prior to the filing of this petition for involuntary termination of parental rights,

and thereafter, J.R.B.'s failure to comply with court-ordered services constitutes a failure to perform parental duties sufficient to warrant the involuntary termination of his parental rights to K.M.C.T. pursuant to 23 Pa.C.S. §2511(a)(1).

(2) J.R.B. has demonstrated an unwillingness or inability to provide K.M.C.T. with the essential parental care necessary for her physical or mental well-being, which is grounds for the involuntary termination of his parental rights to K.M.C.T. pursuant to 23 Pa.C.S. §2511(a)(2).

(3) The termination of J.R.B.'s parental rights will serve the developmental, physical and emotional needs and welfare of K.M.C.T. 23 Pa.C.S. §2511(b).

## DISCUSSION

The grounds for involuntary termination of parental rights are set forth in the Domestic Relations Code at 23 Pa.C.S. §2511. OCYS has alleged grounds for termination pursuant to section 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b), which provide, in pertinent part, as follows:

"Section 2511. Grounds for involuntary termination

"(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

"(1) The parent by conduct continuing for a period of six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

"(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to

be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
. . .

"(6) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
. . .

"(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child. . . .

"(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."

## I. *Involuntary Termination of Mother's Parental Rights*

It is settled law that the petitioner has the burden of proving the alleged grounds for termination by clear and convincing evidence. *Santosky v. Kramer,* 455 U.S. 745 (1982). The Pennsylvania Superior Court has stated that "the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue . . . . It is not necessary that the evidence be uncontradicted, provided it carries 'conviction to the mind' or carries 'a clear conviction of its truth.' " *In re Adoption of J.J.,* 511 Pa. 590, 595-96, 515 A.2d 883, 886 (1986), citing *La Rocca Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963). The burden of proof is high because Pennsylvania law recognizes that the family unit is an important one, and the bonds of family should not be lightly or easily severed. *In re Bowman,* 436 Pa. Super. 10, 647 A.2d 217 (1994).

Nevertheless, Pennsylvania law also recognizes that the rights of parenthood are accompanied by responsibilities. *In re Adoption of J. J.,* 511 Pa. at 602, 515 A.2d at 890. Where a parent fails or refuses to perform parental duties for a period of six months immediately prior

to the filing of the petition for termination, then grounds for termination of parental rights exist. 23 Pa.C.S. §2511(a)(1).

The record in this case demonstrates that Mother has not met her responsibilities to K.M.C.T., M.J.T. and S.L.C.S. Since the juveniles' placement, Mother has failed to comply with court-ordered services. Specifically, Mother has failed to successfully complete non-offending parent treatment or a psychological evaluation. Mother made early attempts to attend therapy at Confront, but on May 25, 2005, she was discharged for nonattendance. Mother attempted to reinitiate therapy, but was again discharged on February 20, 2006, for lack of compliance. Mother has also failed to maintain housing and is presently incarcerated. Thus, it is clear that Mother has failed to perform her parental duties.

The statute for terminating parental rights outlines certain minimum requirements that must be satisfied. *In re Diaz,* 447 Pa. Super. 327, 334, 669 A.2d 372, 375 (1995). "Grounds for termination can consist of lack of capacity and not just affirmative misconduct." *In re E.M.,* 533 Pa. 115, 120, 620 A.2d 481, 484 (1993). If a parent fails to cooperate, or appears incapable of benefiting from the reasonable efforts supplied by the agency over a realistic period of time, the agency has fulfilled its obligations and termination of parental rights is warranted. *In re Lilley,* 719 A.2d 327, 332 (Pa. Super. 1998).

The evidence in this case establishes that Mother does not have the capacity to parent the juveniles. Prior to being taken into custody by OCYS on May 28, 2004, Mother failed to protect her children from C.L.W., a sexual predator that she allowed to reside with her and

juveniles. After May 28, 2004, Mother has continued to demonstrate a lack of responsibility. When given opportunities to visit with S.L.C.S., K.M.C.T. and M.J.T., Mother has failed to show up a large part of the time. She missed one visit in December 2005, one in February 2006, two in March 2006, and two in April 2006. A parent has an affirmative duty to work toward reunification.

Once the court has determined that one or more of the statutory grounds for involuntary termination have been satisfied, the court must further determine whether termination will serve the needs and welfare of the child. 23 Pa.C.S. §2511(b); *In re E.S.M.,* 424 Pa. Super. 296, 304, 622 A.2d 388, 392 (1992). The court must give "primary consideration" to this issue. *Id.* In making this determination the court must consider the emotional bonds between the parent and child. *In re Involuntary Termination of C.W.S.M. and K.A.L.M.-S.,* 839 A.2d 398, 403 (Pa. Super. 2003).

S.L.C.S. and K.M.C.T. have an attachment to Mother, but it is an unhealthy attachment. S.L.C.S. says that she loves Mother, but that it would be okay for her to be adopted. S.L.C.S. lacks an emotional bond with Mother and S.L.C.S. does not believe that Mother will protect her or nurture her. K.M.C.T. states that she loves Mother, but that she is scared by the idea of living with her. From this evidence we conclude that S.L.C.S. and K.M.C.T. are not emotionally bonded to Mother.

M.J.T. also lacks an emotional bond with Mother. M.J.T. was diagnosed with reactive attachment disorder, which indicates that he does not have an attachment to Mother. Reactive attachment disorder occurs when a

child does not form a healthy emotional bond with his birth parents at a young age.

We conclude that severing the bond between Mother and the juveniles would not cause any harm to S.L.C.S., K.M.C.T. or M.J.T. It is important for the juveniles to feel safe and secure in the custody of their caregivers.

The record provides clear and convincing evidence that the juveniles have been in the care of OCYS since May 28, 2004, over two years, and that Mother has failed to comply with court-ordered services. The juveniles' needs will be best served by terminating Mother's parental rights.

Mother raises several evidentiary issues. She first contends that the court erred in admitting reports from Confront, a drug rehabilitation agency, that are physically attached to, but not incorporated into, court orders promulgated after permanency review hearings on March 8, 2005, and November 29, 2005. Mother makes a similar argument regarding a court summary provided by OCYS, which she asserts is attached to the November 29, 2005 order. However, these objections have been waived. Pennsylvania Rule of Evidence 103 provides that no judicial error may be found in the admission of evidence unless there has been a timely objection stating the specific ground for the objection or unless the ground for the objection is apparent from the context. Mother's counsel made only a general objection to the admissibility of petitioner's exhibit 6, the juvenile court orders. He did not specify any ground for the objection at the time of trial, and the grounds are not apparent from the context.

Mother also objected to testimony from Sharon Dunn, the caseworker, regarding M.J.T.'s lack of attachment to

Mother and the diagnosis of reactive attachment disorder. Again, however, Mother's counsel made only a general objection without any indication as to the grounds. Several grounds are now advanced in Mother's brief, but it is impossible to determine which of these grounds, if any, counsel had in mind at trial. Therefore, this objection also has been waived.

## II. *Involuntary Termination of J.R.B.'s Parental Rights*

The grounds for involuntary termination of parental rights are set forth in the Domestic Relations Code at 23 Pa.C.S. §2511. OCYS has alleged grounds for termination of the rights of J.R.B. pursuant to section 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b), *supra.*

As noted above, the petitioner has the burden of proving all alleged grounds for termination by clear and convincing evidence. *Santosky v. Kramer,* 455 U.S. 745 (1982). The record in this case demonstrates that J.R.B. has not met his responsibilities to K.M.C.T. He has not made consistent and meaningful efforts to remain in her life and find stable housing. More recently J.R.B. has also relapsed into drug addiction. He has not modified his lifestyle in order to parent his daughter.

The statute for terminating parental rights outlines certain minimum requirements that must be satisfied. *In re Diaz,* 447 Pa. Super. 327, 334, 669 A.2d 372, 375 (1995). "Grounds for termination can consist of lack of capacity and not just affirmative misconduct." *In re E.M.,* 533 Pa. 115, 120, 620 A.2d 481, 484 (1993). If a parent fails to cooperate, or appears incapable of benefiting from the reasonable efforts supplied by the agency over a

realistic period of time, the agency has fulfilled its obligations and termination of parental rights is warranted. *In re Lilley,* 719 A.2d 327, 332 (Pa. Super. 1998).

J.R.B. continues to demonstrate lack of responsibility for K.M.C.T. It is evident that J.R.B. does not have the capacity to parent his child due to his lack of adequate housing and inconsistent visitation with K.M.C.T. Between November 29, 2005 and May 2, 2006, J.R.B. missed 11 out of 16 scheduled visits. A parent has an affirmative duty to work toward reunification. The record provides clear and convincing evidence that K.M.C.T. has been in the care of OCYS since May 28, 2004, over two years ago, that J.R.B. has failed to overcome his obstacles.

Once the court has determined that the statutory requirements for involuntary termination have been satisfied, the court must further determine whether termination will serve the needs and welfare of the child. 23 Pa.C.S. §2511(b); *In re E.S.M.,* 424 Pa. Super. 296, 304, 622 A.2d 388, 392 (1993). In such situations, parental rights must be terminated to give way to the child's rights.

In this case, the attorney for K.M.C.T. supports the petition for termination of J.R.B.'s parental rights. She asserts that J.R.B. cannot take on the responsibility of caring for K.M.C.T. She recommends terminating Father's parental rights in order to benefit the welfare of the juvenile.

Accordingly, we find that grounds for termination of J.R.B.'s parental rights under 23 Pa.C.S. §2511(a)(1) and (2) have been satisfied. The juvenile's needs will be best served by terminating J.R.B.'s parental rights. For the

reasons stated, the parental rights of J.R.B. are terminated as to his daughter K.M.C.T.

OCYS has not proven the grounds for termination of J.R.B.'s parental rights pursuant to 23 Pa.C.S. §2511(5) and (8). These sections require that the juvenile be removed from the care of J.R.B. when taken into custody by OCYS. *In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000). In this case, K.M.C.T. was removed from the care of Mother, not J.R.B.

FINAL DECREE

Now, September 12, 2006, upon consideration of the petitions filed by the Office of Children and Youth Services, and after a hearing held on June 8 and 9, 2006, this court finds that the petitioner has, by clear and convincing evidence, proven grounds for the involuntary termination of the parental rights of the father of M.J.T.

Therefore, it is ordered, pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), (8) and (b), that the parental rights of B.[92] in and to M.J.T., minor, be and are terminated herewith.

It is additionally ordered that custody of M.J.T., minor, shall remain with the Office of Children and Youth Services, which agency shall have the right to proceed with the adoption of the minor without further notice to or consent of B.

---

92. The only information on the identity of the biological father of M.J.T. is that his first name is "B." For this reason, he was served notice of the hearing to terminate his parental rights by publication in *The Morning Call* on May 19 and 26, 2006.

## FINAL DECREE

Now, September 14, 2006, upon consideration of the petitions filed by the Office of Children and Youth Services, and after a hearing held on June 8, and 9, 2006, and for the reasons expressed in the accompanying opinion, this court finds that the petitioner has, by clear and convincing evidence, proven:

(1) grounds for the involuntary termination of the parental rights of the mother of the above-captioned minors; and

(2) grounds for the involuntary termination of the parental rights of the father of K.M.C.T.

Therefore, it is ordered, pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), (8) and (b), that the parental rights of M.L.T. in and to K.M.C.T., minor, M.J.T., minor, and S.L.C.S., minor, be and are terminated herewith.

It is further ordered, pursuant to 23 Pa.C.S. §2511(a) (1) and (2) and (b) that the parental rights of J.R.B., in and to K.M.C.T., minor, be and are terminated herewith.

It is additionally ordered that custody of K.M.C.T., minor, M.J.T., minor, and S.L.C.S., minor, shall remain with the Office of Children and Youth Services, which agency shall have the right to proceed with the adoption of the minors without further notice to or consent of M.L.T. or J.R.B.