J-S52015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: D.N. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C.M.N., FATHER | No. 288 EDA 2014 |

Appeal from the Order entered January 2, 2014,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000315-2013;
CP-51-DP-0000156-2012, FID 51-FN-001196-2011

BEFORE:    GANTMAN, P.J., ALLEN, and FITZGERALD*, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED DECEMBER 18, 2014**

J.C.M.N. ("Father") appeals from the order involuntarily terminating his parental rights to his minor child, D.N. ("Child"), born in January of 2012, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[1]  We affirm.

The trial court summarized the facts and procedural history of this case as follows:

> On January 23, 2012, Mother contacted the Department of Human Services [("DHS")] and left telephone messages indicating that she was refusing to cooperate with the reunification efforts with her one year old son, [I. M]other insisted she was overwhelmed and wanted to relinquish custody of another child, [Child.]  Mother then requested the [DHS] social worker visit and speak with her at home. The [DHS] social worker made a visit to [M]other's home and [M]other was not present.

---

* Former Justice specially assigned to Superior Court.

[1] The parental rights of Child's mother, I.M.O.S. ("Mother"), were terminated by a separate decree entered December 14, 2012.  Mother is not a party to this appeal.

Mother contacted [DHS] as a result of a physical altercation with [F]ather in the presence of [Child]. Upon further investigation, [DHS] learned that [M]other and [F]ather had a history of domestic violence.

On January 26, 2012[, DHS] obtained an order of Protective Custody (OPC) and placed [Child] in a foster home through the Juvenile Justice Center.

A shelter care hearing was held on January 27, 2012. The [OPC] was lifted and [Child] was temporarily committed to [DHS]. [Child] was placed in the care of a family member.

On February 1, 2012, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. [Child] was adjudicated dependent and committed to [DHS]. The [c]ourt ordered both parents to the Clinical Evaluation Unit for a forthwith drug screen, dual diagnosis, assessment and monitoring. Both parents were ordered to the Achieving Reunification Center (ARC) program for reunification services.

A Family Service Plan [("FSP")] meeting was held by [DHS]. The [FSP] objectives for the parents were (1) to continue to occupy suitable housing, (2) to achieve and maintain recovery from drug and/or alcohol abuse (3) to sign authorization forms to allow the release of copies of the evaluation and progress reports (4) to comply with all treatment recommendations including therapy and/or medications. The objectives specifically identified for [F]ather were (1) participate in mental health evaluation and treatment, (2) refrain from use of physical violence or threats to resolve family conflicts, (3) maintain employment and (4) enroll in a GED or job training program[.]

The parents did not attend the FSP meeting and did not sign the Family Service plan.

A permanency review hearing was held on April 30, 2012. The [c]ourt received a report of noncompliance from Clinical Evaluation Unit regarding [F]ather's court ordered drug screens. [DHS] was to explore the maternal

grandmother's home as a placement resource. The [c]ourt ordered that [Child] could be moved prior to the next court date if maternal grandmother's home was appropriate.

The matter was then listed on a regular basis before Judges of the Philadelphia Court of Common Pleas-Family Court Division-Juvenile Branch pursuant to Section 6351 of the Juvenile Act, 42 Pa. C.S.[ § ] 6531] and evaluated for the purpose of determining or reviewing the permanency plan of [Child] with the goal of reunification of the family.

Trial Court Opinion, 4/16/14, at 1-2 (unnumbered).

On May 28, 2013, DHS filed a petition to terminate Father's parental rights to Child. A termination hearing was held on January 2, 2014, and the trial court thereafter entered an order terminating Father's rights. Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father raises the following issues for our review.

1. Did [DHS] sustain the burden that [F]ather's rights should be terminated when there was evidence that [F]ather had completed almost all of his permanency goals?

2. Was there sufficient evidence presented to establish that it was in the best interest of [Child] to terminate [F]ather's parental rights?

Father's Brief at 4.

Our standard and scope of review is well-established:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent

evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). "[O]ur standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

Furthermore:

> Termination of parental rights is controlled by statute. *See* 23 Pa.C.S.A. § 2511[.] Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (some citations omitted).

We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to

- 4 -

> determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

> Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. . . .

*In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006) (citations omitted).

Our Supreme Court has opined:

> that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*In re S.P.*, 47 A.3d at 830.

Section 2511 of the Adoption Act, which sets forth grounds for involuntary termination, provides in pertinent part:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

This Court "need only agree with [a trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the case at bar, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b). We first address whether the trial court properly terminated Father's parental rights pursuant to Section 2511(a)(2).[2]

---

[2] We note that the trial court concluded incorrectly that Father's parental rights could be terminated under Sections 2511(a)(5) and (a)(8). Both of these subsections require that the subject child have "been removed from the care of the parent by the court or under a voluntary agreement with an agency." 23 Pa.C.S. § 2511(a)(5), (8). Because Child was never in Father's care, his parental rights cannot be terminated under these sections. *See In re C.S.*, 761 A.2d 1197, 1200 (Pa. Super. 2000) (*en banc*) (concluding termination was inappropriate under Sections 2511(a)(5) and (8) "because the record reflects that C.S. was never in [the a]ppellant's care and,

The Pennsylvania Supreme Court set forth our inquiry under section 2511(a)(2) as follows:

> . . . § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . . .
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

Instantly, Father argues that the trial court abused its discretion by terminating his parental rights to Child, because he "had completed most of his FSP goals and was actively completing the remaining goals." Father's Brief at 10. Father states that he did not "fail to perform his parental duties insofar as he was permitted to do so by DHS," and that he "was visiting consistently with [Child] except the time he was in custody and attending his inpatient drug treatment program." *Id.* at 10-11. We disagree.

---

therefore, could not have been removed from his care."); *see also In re Z.P.*, 994 A.2d 1108, 1123 n.2 (Pa. Super. 2010) (same).

At Father's termination hearing, DHS social worker, Ms. McCloud,[3] testified as follows: Child had been in foster care since she was two months old, for a total of twenty-three months. N.T., 1/2/14, at 5. Child has been in the custody of DHS since that time. *Id.* Father had never provided for Child's needs, nor had Child ever lived with Father. *Id.* at 20, 33-34. Father was attending supervised visits with Child. *Id.* at 19. However, besides being a "visitation resource," Father had not "expressed behavior or actions of being a parent" to Child. *Id.* at 15. Father had not contacted Ms. McCloud "to ask about the development of his child or the well[-]being of his child . . . ." *Id.* at 11-12, 19. Father had another child adopted "during the pendency of this case." *Id.* at 16-17. The record also reveals that Father has a criminal history. Ms. McCloud testified that when Father was incarcerated, he did not contact DHS to ask about the welfare of Child. *Id.* at 13.

Additionally, Ms. McCloud explained that Father had failed to complete a variety of FSP goals. Besides visiting Child, Father was required to obtain a GED and employment, complete mental health treatment, domestic

---

[3] The notes of testimony indicate that the DHS social worker was Ms. McCloud, and her first name was "inaudible." N.T. at 3. However, in its Appellee's brief, DHS indicates that the social worker testifying for DHS at the hearing was Ms. McLeod. DHS Appellee's Brief at 5 n.2. The record reveals that both a Ms. McCloud and Rosetta McLeod participated in this case on behalf of DHS. *See*, *e.g.*, DHS' Pet. Goal Change to Adoption, 5/28/13; Permanency Review Order, 2/6/13; Am. Order of Adjudication & Disposition-Dependent, 2/1/12. In our above summary of the testimony, we adopt the transcript's identification of "Ms. McCloud" as the witness.

violence treatment, and drug and alcohol treatment. *Id.* at 6-8. With respect to Father's progress in accomplishing these goals, Ms. McCloud noted that "Father was taking classes at ARC for his GED and he was also taking classes at ARC for employment." *Id.* at 8. Father was "receiving some type of treatment at ARC for mental health." *Id.* She testified that Father never finished mental health treatment. *Id.* at 11. When Father was incarcerated he did not contact DHS "to ask about the well[-]being of" Child. *Id.* at 13. In order to satisfy his drug and alcohol FSP goal, she explained Father would need to complete "[i]ntensive outpatient" treatment, which would take "[a]pproximately another six to nine months." *Id.* at 15-16. She testified that Father was on probation and living in a "recovery house" at the time of the hearing. *Id.* at 18. A recovery house is a group home where other people who are on probation reside. *Id.*

The Child Advocate cross-examined Ms. McCloud, *inter alia*, as follows:

> Child Advocate: Now, you have been on this case the entire time, haven't you?
>
> A: Correct.
>
> Q: And can you just briefly tell us a little about [Child]. Does she have medical needs?
>
> A: There were some issues about developmental delays and a birth defect, but all those were ruled out. She had MRIs and testing done and there are no issues with [Child's] developmental milestones.
>
> Q: Did [Father] ever attend any of her medical appointments?

A: Not that I can recall.

Q: Did Father participate in any of ther [sic] early intervention studies or classes?

A: No.

Q: . . . [W]hat is the nature of Father's visitation, supervised or unsupervised?

A: Supervised.

Q: Has he ever progressed beyond supervised?

A: No.

Q: He has not ever had any overnights, correct?

A: No.

Q: And who takes care of all [Child's] needs?

A: Currently the foster parent[s].

Q: And they give her comfort and they take care of her when she is sick?

A: Yes.

Q: Has her Father ever done that for her in her life?

A: No.

Q: And as you testified, she has been in foster care almost since birth, correct?

A: Correct.

*Id.* at 18-20.

Ms. McCloud testified that she visited Child's maternal great aunt and uncle's house on several occasions and found them to be a "good adoptive

resource." *Id.* at 27. She stated that Child had not been placed with her prospective adoptive parents because they "only speak Spanish," and DHS was trying to match the parents with an agency that could provide a Spanish-speaking social worker, and that this was "going to take awhile." *Id.* at 21-22. Child's maternal great-aunt and uncle were also "watining [sic] on an FBI review from the State" because the maternal great-aunt's sister "is disabled and her hands are closed tightly, and the agency was unable to get an FBI clearance on her fingerprints. So, a waiver is being done by the State and that is still pending." *Id.*

Father testified at the termination hearing that he was receiving drug and alcohol treatment at "the NET Frankford" starting "about a week ago." *Id.* at 29. He further stated that he received drug treatment "[a]bout last year" at the "Greater Philadelphia Health Association." *Id.* at 30. He stated that he was attending drug treatment because he "had a drug and alcohol problem." *Id.* at 31.

Father estimated he had approximately "six convictions for selling, dealing and using drugs." *Id.* at 32. Father was incarcerated sometime during "June 2012 and July 2012"; he admitted that he spent "about five months" in jail, at three different locations. *Id.* at 33. The sole testimony elicited from Father regarding Child was that Child never lived with him and that he "did actually" parent child. *Id.* at 33-34.

The trial court found that testimony adduced at the hearing "established that Father neglected to meet the parental care needs for" Child. Trial Court Opinion, 4/16/14, at 4. The court stated that Father failed to attend Child's medical appointments, and that he did not "express any interest in learning about the well[-]being of [Child]." *Id.* His "repeated incarcerations caused instability in the care of" Child. *Id.* The court noted that Father "admitted a history of drug abuse and mental health issues." *Id.* He also "admitted repeated periods of incarceration due to drug convictions for selling and/or using drugs." *Id.*

After careful review, we determine that the record supports the trial court's conclusion that DHS proved by clear and convincing evidence that Father has not resolved the issues that led to his inability to parent Child. As we find that there is competent evidence in the record to support the trial court's credibility and weight determinations, we find no abuse of the court's discretion in concluding that DHS sustained its burden with regard to Section 2511(a)(2). *See In re S.P.*, 47 A.3d at 826. Father's repeated periods of incarceration have impaired his ability to parent Child. He has shown little interest in Child's well-being. Further, at the time of the termination hearing, Father had failed to complete the FSP objectives necessary to obtain custody of Child. Child has been without parental care and control for nearly her entire life, and it was reasonable for the trial court to conclude that Father cannot, or will not, remedy this incapacity. We therefore agree

with the trial court that DHS has sustained its burden to show grounds for termination under Subsection 2511(a)(2).  ***See id.***

Next, we consider Father's claim that DHS failed to establish by clear and convincing evidence that termination of his parental rights would best serve the "developmental, physical, and emotional needs and welfare of" Child.  Father's Brief at 12.  Father contends there was insufficient evidence to establish that it was in Child's best interest to be adopted.  ***Id.*** at 13. Father avers there was not "enough information to accept the opinion of the DHS worker" that there was no bond between Child and Father.  ***Id.*** at 14. We disagree.

The focus in terminating parental rights under 23 Pa.C.S.A. § 2511(a) is on the parent, but the focus turns to the child under Subsection 2511(b). ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). The statute provides in pertinent part:

> **(b)   Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  …

23 Pa.C.S.A. § 2511(b) (underline added).   The requisite analysis is as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.  In ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."

- 13 -

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted). Our Supreme Court has confirmed, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Our Supreme Court quoted this Court with approval:

> … Judge Tamilia cautioned against denying termination of parental rights based solely on the fact that a child has an attachment to the parent: "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id*. at 535 (*quoting In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J., dissenting).

*In re T.S.M.*, 71 A.3d at 267 (footnote omitted). In addition, our Supreme Court stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). "[T]he mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 71 A.3d at 267. Moreover, in weighing the bond considerations pursuant to Subsection 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Here, the trial court found that Child "would not suffer any irreparable emotional harm if [F]ather's parental rights were terminated," and that termination was in Child's best interests. Trial Court Opinion, 4/16/14, at 5. The court reasoned that Child had been in care since she was two months old, that Child did not have a bond with Father, and that Child's maternal aunt and uncle are "willing to adopt her and provide long term stability and permanency." *Id.* The court stated that Father did not "progress beyond supervised visits due to his non compliance [*sic*] with his FSP objectives." *Id.* The court emphasized that Father "did not have appropriate housing" for Child, and has a "history of drug abuse and failure to seek mental health treatment." *Id.*

Our review confirms that Child was born in January of 2012, and has been dependent since she was two months old. N.T., 1/2/14, at 5, 11. Father has never had custody of Child. Father has multiple issues which negatively impact his capacity to parent (including approximately "six convictions for selling, dealing and using drugs", *id.* at 32); those issues support termination pursuant to 23 Pa.C.S.A. § 2511(a). *See, supra*. Ms. McCloud, the DHS social worker throughout Child's dependency, testified that Father had not progressed beyond supervised visits with the Child, and had no overnights with the Child. *Id.* at 19. Conversely, Ms. McCloud testified that Child's foster parents were the ones who "take care of all of [Child's] needs." *Id.* (emphasis added). Ms. McCloud opined that adoption

- 15 -

was in Child's best interests, and that Child's great aunt and uncle were anxious to adopt Child. *Id*. at 15.

Ms. McCloud testified unequivocally that adoption was in Child's best interests and no bond existed between Father and Child. *Id*. We find further evidence of the bond between Father and Child to be unnecessary to the trial court's ultimate determination that termination served Child's needs and welfare. Even if there was a bond between Father and Child, that bond would not "necessarily result in the denial of a termination petition." *T.S.M., supra*. Accordingly, we reject Father's contention that DHS failed to establish by clear and convincing evidence that termination of his parental rights would best serve the developmental, physical, and emotional needs and welfare of Child.

For the above reasons, we find no error in the trial court's exercise of its discretion, and affirm the order terminating Father's parental rights.

Order affirmed.

President Judge Gantman joins the memorandum.

Justice Fitzgerald files a dissenting statement.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/2014