J-A15014-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.I.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.T.S., FATHER | No. 115 EDA 2019 |

Appeal from the Order Entered December 10, 2018
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2018-A0109

BEFORE: BENDER, P.J.E., GANTMAN, P.J.E., and COLINS,J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 12, 2019**

T.T.S. (Father) appeals from the order entered on December 10, 2018, that granted the petition filed by the Montgomery County Office of Children and Youth (OCY) to involuntarily terminate his parental rights to his child, A.I.S. (Child), born in July of 2011. We affirm.

We begin by noting that the OCY filed termination petitions with regard to Child and Father's two other children, twins A.J.S. and A.N.S., both born in March of 2017. Father appealed to this Court seeking reversal of the trial court's orders terminating his parental rights to all three children. However, on February 28, 2019, Father filed a petition with this Court to discontinue the appeals relating to the twins. Therefore, the only appeal presently before this panel concerns the termination of Father's parental rights to Child.[1]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The parental rights of J.S. (Mother) to the three children were also terminated by the trial court at the same time. Mother is not a party to this appeal.

In its Pa.R.A.P. 1925(a) opinion, the trial court explained that in the transcript of the December 6, 2018 hearing, it addressed its "reasoning as to the entry of the [o]rders appealed from...." Trial Court Opinion, 1/7/19. In order to address Father's issues raised on appeal, we set forth parts of the court's discussion of its findings, as follows:

> The three ... children entered OCY custody during March and April of 2017.
>
> Twins ... were born premature with allegedly no prenatal care and addicted to drugs on March [], 2017. Upon their respective releases from the hospital neonatal intensive care unit, the twins were placed in [the] custody of OCY on March 16 and April 3 of 2017.
>
> The oldest child ... went into OCY custody on April 10, 2017, following a police raid for drugs at the family home on April 7, 2017.
>
> Prior to the police raid and after the birth of the twins, both parents tested positive for drugs on March 28, 2017, and both admitted using drugs.
>
> The initial Family Service Plan of the Office of Children & Youth was created on April 10, 2017. Subsequent plans were dated June 27, 2017, and December 27, 2017. Neither parent successfully achieved their Family Service Plan goals.
>
> * * *
>
> Birth [F]ather has been in jail since May the 9th, 2017, approximately 19 months. According to OCY Exhibit 13, birth [F]ather visited all kids once on May 4, 2017, before going to the jail.
>
> While the twins were in OCY custody, birth [F]ather visited the twins four times. Since going to jail, birth [F]ather only visited [Child]. Those visits began by video on November 27, 2017. There have been no visits with the twins since then due to a court order.

OCY Exhibit 14 contains birth [F]ather's acknowledgment of cocaine and opiate drug use. Birth [F]ather has not submitted a urine test since March 28, 2018, due to his incarceration.

The twins have never been in the custody of their birth parents.

When [Child] entered OCY custody, she required significant dental work and was behind in receiving her required immunizations. She suffered from significant facial tics, her mobility was impacted by constant tiptoe walking.

The children have lived in foster homes since entering OCY custody. The twins live together in one foster home, while [Child] resides in a separate foster home. The parents in both foster homes have worked diligently to address the special needs of the children, especially [Child] and [the female twin]. Since coming into their lives the foster parents have developed a close bond wherein the children have come to rely on their foster parents to meet all of their needs, both physical and emotional.

* * *

Birth [F]ather has a limited bond with [Child]. This bond is filled with uncertainty that fuels [Child's] current state of instability.

N.T., 12/6/18 at 108-11.

The trial court then discussed its findings as they relate to the grounds for termination set forth in 23 Pa.C.S. § 2511(a)(1), (2) and (8). The court indicated that the parents' drug use could equate with an incapacity to parent and gross negligence. As for Father, the court considered his incarceration and the lack of evidence of his attempts to avoid incarceration. The court also considered the children's needs and welfare under 23 Pa.C.S. § 2511(b), stating:

Currently in this case[,] the testimony clearly established that there is affection between birth [F]ather and [Child]. Currently on video and that video showed that [C]hild does react or interact

- 3 -

with her [F]ather. Birth [F]ather has maintained throughout his video visits as well as the prison visits prior to that consistent contact and the [c]ourt received credible evidence and testimony that there is a limited parental bond between the [C]hild and birth [F]ather.

\* \* \*

Despite the bond, this [c]ourt has not heard any evidence that the birth parents or in this case more specifically the birth [F]ather is ready to go home with [Child] today. Today is your day in court. Father does not have a home. He is unable to give a time frame for when he will go home.

\* \* \*

In the case before me[,] I find that a parental bond between birth [F]ather and [Child] exists. I find that there is no bond between either birth parent and the twins.

I find that a stronger bond exists between [Child] and her foster parents and I find that an even stronger bond exists between the twins and their foster parents.

The children have a close relationship with their foster parents. Both sets of foster parents are advocates for these children[,] meeting their physical and their emotional needs to the point where the children have come to rely on them for love and stability.

Therefore, I find from the evidence and testimony that termination of the birth mother's and the birth [F]ather's rights best serves the needs and the welfare of [the children], and that termination of the parental rights of the birth mother and the birth [F]ather will not irreparably harm any of the children.

N.T. at 117-19.

Father filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). He raises the following issues for our review:

- 4 -

1. DID THE TRIAL COURT ERR IN REFUSING TO CONTINUE THE TRIAL UNTIL AFTER THE OUTCOME OF [FATHER'S] OPEN AND RELATED CRIMINAL MATTER, WHICH WOULD THEREBY PERMIT [FATHER] TO TESTIFY WITHOUT VIOLATING HIS RIGHT TO REMAIN SILENT UNDER THE 5TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 9 OF THE PENNSYLVANIA CONSTITUTION?

2. DID THE TRIAL COURT ERR IN TERMINATING [FATHER'S] PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.[] § 2511(A)(1) WHERE BIRTH FATHER (I) PARTICIPATED IN EVERY VISIT MADE AVAILABLE TO HIM PRIOR TO AN[D] DURING HIS INCARCERATION, (II) MAINTAINED CONTACT WITH OCY, AND (III) SHOWED APPROPRIATE LOVE AND CONCERN FOR HIS CHILDREN?

3. DID THE TRIAL COURT ERR IN TERMINATING [FATHER'S] PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.[] § 2511(A)(2) SOLELY DUE TO HIS INCARCERATION?

4. DID THE TRIAL COURT ERR IN TERMINATING [FATHER'S] PARENTAL RIGHTS PURSUANT TO 23 PA.C.S.[] § 2511(A)(8) WHERE PETITIONER PRESENTED NO EVIDENCE THAT THE CIRCUMSTANCES LEADING TO OCY INVOLVEMENT COULD NOT OR WOULD NOT BE REMEDIED?

5. DID THE TRIAL COURT IMPROPERLY SHIFT THE BURDEN TO BIRTH FATHER WHEN TERMINATING PURSUANT TO 23 PA.C.S.[] § 2511(A)(1) AND (2)?

6. DID THE HONORABLE TRIAL COURT COMMIT ERROR BY INVOLUNTARILY TERMINATING [FATHER'S] PARENTAL RIGHTS TO THE CHILDREN WHERE THE EVIDENCE CONFIRMED THAT A STRONG AND LOVING BOND EXISTED BETWEEN BIRTH FATHER AND THE CHILDREN AND THAT THE PETITIONER WAS UNABLE TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN AS CONTEMPLATED BY 23 PA.C.S.[] § 2511(B)?

7. DID THE HONORABLE TRIAL COURT ERR IN ADMITTING AND RELYING UPON HEARSAY EVIDENCE WITHIN THE CERTIFIED RECORDS OF [FATHER'S] CRIMINAL MATTERS?

Father's brief at 4.

We begin by addressing Father's first issue relating to his request for a continuance until after the outcome of his criminal matter. The basis for this request was his concern that his testimony at the termination hearing would implicate his 5th Amendment right to remain silent. Father claims that "[t]he trial court impermissibly forced Father into a 'catch-22' of his constitutional rights, forcing him to choose between exercising his right against self-incrimination and his right to parent his child." Father's brief at 8. To explain the interrelationship between Father's criminal charges and the termination proceeding, Father's brief contains the following:

> Here, Father possessed a right against self-incrimination on the pending criminal charges against him at the time of the termination of parental rights hearing. First, he faced charges for drug delivery resulting in death and related offenses. Father also faced criminal charges for endangering the welfare of a child and related offenses. This second set of charges arose from a police search of Father's home, which he shared with Mother, Paternal Grandmother, and [Child]. Those criminal charges are inextricably entwined with OCY taking custody of [Child], as OCY took custody of [Child] because the police executed the search warrant, which resulted in those criminal charges. Father has not yet been convicted of the crimes of endangering the welfare of a child and possession of drug paraphernalia.[6] Therefore, at the time of trial on this matter, he continued to possess his right against self-incrimination.
>
> [6] Birth [F]ather subsequently pleaded guilty on December 13, 2018[,] and was sentenced to an aggregate prison term of 9½ to 20 years between both criminal matters.

*Id.* at 9 (some footnotes omitted). Thus, Father contends that because the criminal matters were still outstanding at the time of the termination hearing,

any statements he made could have been used against him in the criminal proceeding.

Interestingly, Father relies on **In re Adoption of J.J.**, 530 A.2d 908 (Pa. Super. 1987), for the proposition that a parent has a constitutional right to parent his child. However, he overlooks the portion of the **J.J.** opinion, which provides that:

> [I]t is also the duty of our courts to protect children from abuse and neglect. The judicial system is society's last line of defense against parental misconduct. Though we must respect the parent-child relationship, we cannot afford it total deference. A parent has the right to raise his child as he sees fit within the bounds of decency and reason. He does not have a license to abuse and neglect his helpless dependent.

**Id.** at 913.

Simply stated, Father could have testified about his ability to care for Child, *i.e.*, his capacity to parent, and his ability to meet Child's needs. He then could have relied on his 5th Amendment right in response to any questions directed to him about his criminal charges. Instead, Father chose not to testify, thus, providing no evidence about his abilities relating to child-rearing. As a result, Father has not convinced us that a continuance would have changed the circumstances, especially in light of his pleading guilty to the criminal charges a week after the termination hearing concluded. Father is not entitled to any relief.

We next turn to the tenets that guide this Court when we review an order terminating parental rights.

Appellate review of termination of parental rights cases implicate the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009) (quoting *In re S.D.T.*, Jr., 934 A.2d 703 (Pa. Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted).

*In re Z.P.*, 994 A.2d 1108, 1115-16 (Pa. Super. 2010).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

As noted above, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (8) and (b). However, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d at 384. Father's brief provides argument regarding the three subsections of Sections (a) and (b), listed as issues 2, 3, 4 and 6. We have chosen to address and analyze the court's decision to terminate Father's parental rights under Section 2511(a)(1) and (b), which provide:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

- 10 -

In *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010), this Court provided direction relating to what considerations need to be addressed when reviewing a trial court's decision to terminate parental rights under various subsections of 2511(a). Specifically, relating to subsection (a)(1), the *Z.P.* Court stated:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition. *In re C.S.*, *[761 A.2d 1197 (Pa. Super. 2000)]*. The court should consider the entire background of the case and not simply:
>
> > mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his … parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.
>
> *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (citing *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999)).

*In re Z.P.*, 994 A.2d at 1117 (emphasis in original).

In his brief, Father's argument, addressing subsection (a)(1), centers on his allegation that OYC failed to carry its burden showing that "Father failed to parent or evidenced a settled purpose of relinquishing his parental rights." Father's brief at 11. He also claims that he took affirmative steps to parent and attended every visitation offered him. The court addresses its findings and conclusions in its discussion at the December 6, 2018 hearing, stating:

> To satisfy the requirements of Section 2511(a)(1)[,] the moving party must produce clear and convincing evidence of conduct sustained for a period of six months, at least six months, prior to

the filing of the petition, so that's the time frame I talked about earlier from December of 2017 to June of 2018[,] which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. Once the evidence establishes that failure to perform parental duties or that settled purpose of relinquishing parental rights, then I have to look at another three lines of inquiry. And as I stated just now, I believe that both birth mother and birth [F]ather have evidenced before this [c]ourt or the evidence has been clear and convincingly determined by me that the parents have refused to perform their parental duties and it reflects, clearly reflects, a settled purpose of relinquishing their parental rights.

So now the next three things that I have to look at is the parents' explanation of their conduct. I looked over my notes. I looked over them again. And I didn't see anything. I did not see one bit of evidence related to the parents' explanation for their conduct.

So then the second thing that I had to look at was the post-abandonment contact between the parent and the child. I received no evidence related to birth mother's contact. I did receive evidence regarding birth [F]ather's contact, but only as it related to [Child].

So the final consideration that this [c]ourt has to look at is the effect that terminating the parental rights would have on the children pursuant to Section 2511(b). Those factors are listed in the case In re: ZSW, cited at 946 A.2d 726 and 730. That is a 2008 Superior Court case.

In this case at hand, the [c]ourt hereby determines that OCY has established by clear and convincing evidence that both birth parents have failed to perform any parental duties for a period of more than six months prior to the filing of the petition for termination of parental rights as cited under Section (a)(1).

N.T. at 112-14.

Essentially, the trial court found that Father failed to complete the objectives set out in the family service plan during the period beginning prior to the six-month period before the filing of the petition. Moreover, Father

provided no explanation relating to his conduct or his capability of even performing minimal parenting duties, particularly in light of his incarceration, which he claims was the sole basis for the court's decision. The court's comments relating to Father's incarceration note that Father's lack of testimony provided nothing to convince the court that Father attempted in any way to avoid incarceration or to give an explanation about his conduct or overcome any obstacles to his parenting. *See In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012) (stating, "that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of proving 'essential parental care, control or subsistence....'"). Although evidence was presented as to his contact with Child, none was provided by Father himself in that he did not testify and the court found that a stronger bond existed between Child and her foster parents. Thus, the court concluded that the termination of his parental rights best serves Child's needs and welfare and that the termination would not irreparably harm her.

Our thorough review of the record reveals that the trial court did not abuse its discretion in ordering the termination of Father's parental rights. The record supports the court's findings and conclusion that Father's refusal or failure to perform parental duties occurred for a period of at least six months prior to the filing of the petition. Moreover, the evidence shows that Child has bonded with foster parents, who satisfy her needs. Additionally, we note that a child's life "simply cannot be put on hold in the hope that [a parent]

will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d. 726, 732 (Pa. Super. 2008) (citation omitted). "[A] parent's basic constitutional right to the custody and rearing of [his or her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856. Since Father has not convinced us otherwise, we conclude that he is not entitled to any relief.

In his fifth issue, Father contends that the court improperly shifted the burden of proof from the agency to him in that there was a lack of evidence about "Father's incarceration and what steps he took to avoid incarceration…." Father's brief at 14. As stated previously in this decision, "the burden of proof is upon the party seeking termination to establish by 'clear and convincing' evidence the existence of grounds for [involuntarily terminating parental rights]." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004). In this case, that entity is OCY. However, the *T.F.* decision also provides that under subsection 2511(a)(1), after the establishment of the factors set forth therein, "the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." *Id.* at 742-43 (quoting *In re: Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 415 (Pa. Super.

2003)) (emphasis added). Here, without any testimony or evidence from Father, he has failed to explain his conduct. Pursuant to *T.F.*, Father is required to counter OCY's evidence to the degree that he must explain his conduct. This is not a shifting of the burden to him, and without an explanation from him, the court did not err in accepting OCY's evidence relating to Father's conduct, *i.e.*, his imprisonment, and its impact on whether a termination of his parental rights was in the best interests of Child. Thus, this argument does not provide Father with relief.

In Father's final issue, he claims that the court erred by "admitting certified court records related to Father's then-pending criminal charges that contained hearsay testimony." Father's brief at 16. Father concedes that a public record constitutes an exception to the hearsay rule. *See* Pa.R.E. 803(8). He states, however, that OCY's exhibits 6 and 7 include two criminal complaints that "set forth the factual allegations against Father which were either direct hearsay or based on hearsay statements." Father's brief at 16. Therefore, he asserts that the court's admission of these statements prejudiced him causing him not to receive a fair hearing. We disagree in that Father has not identified the place in the record where a reference to those documents was made, nor where the court indicated its reliance on those documents to support its decision. Again, this argument does not provide relief to Father.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/12/19</u>