J-S03032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2215 EDA 2022 |

Appeal from the Order Entered August 5, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000494-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2216 EDA 2022 |

Appeal from the Decree Entered August 5, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000774-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.-P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2217 EDA 2022 |

Appeal from the Order Entered August 5, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000495-2020

IN THE INTEREST OF: A.A.P.-M., A MINOR

APPEAL OF: K.M., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
: No. 2218 EDA 2022

Appeal from the Decree Entered August 5, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000775-2021

IN THE INTEREST OF: E.M.-P., A MINOR

APPEAL OF: K.M., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
: No. 2219 EDA 2022

Appeal from the Order Entered August 5, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000496-2020

IN THE INTEREST OF: E.L.M., A MINOR

APPEAL OF: K.M., MOTHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
: No. 2220 EDA 2022

Appeal from the Decree Entered August 5, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000776-2020

BEFORE: BOWES, J., McCAFFERY, J., and SULLIVAN, J.

- 2 -

MEMORANDUM BY SULLIVAN, J.:                    **FILED APRIL 21, 2023**

K.M. ("Mother") appeals from the decrees granting the petitions filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate her parental rights to her children, K.M. (born September 2013), E.M.-P. (born January 2017), and A.M.-P (born May 2018) (collectively, "Children").[1]  Mother also appeals from the orders in Children's dependency cases changing their permanency goals from reunification to adoption.  After careful review, we affirm the termination decrees and dismiss the appeals from the goal change orders as moot.

The relevant facts and procedural history are as follows.  In April 2020, DHS received a report that two-year-old E.M.-P. had a blunt force fracture to the femur of his right leg which neither Mother nor his father ("Father") could explain, and that neither parent had taken the child to the hospital for more than twenty-four hours, despite the fact that E.M.-P. experienced significant pain requiring morphine.  **See** N.T., 8/5/22, at 11, 44-47, 74.  DHS applied for and received orders of protective custody ("OPC") for Children.  In June 2020, the court adjudicated Children dependent.  A court subsequently found

---

[1] The Children are also identified as "K.R.M.," "A.A.P.-M.," and "E.L.M."  The trial court previously terminated the parental rights of the fathers of the three children.  **See** N.T., 8/5/22, at 5-6.  None of the fathers appealed those determinations or participated in this appeal.

Mother and Father had committed child abuse. *See id*. at 45.[2] The court conducted subsequent periodic permanency review hearings.

On December 27, 2021, DHS filed petitions for the involuntary termination of Mother's parental rights to Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and on December 28, 2021, it filed separate petitions to change Children's permanency goals from reunification to adoption. *See* N.T., 8/5/22, at 22. On August 5, 2022, the trial court conducted an evidentiary hearing on the petitions, when Children were ages eight, five, and four, respectively. A guardian *ad litem* ("GAL") and separate legal counsel represented Children. Counsel represented Mother.

At the hearing, Community Umbrella Agency ("CUA") case manager Shavonne Jackson ("Jackson"), testified that she became involved in the case in June 2021. *See id*. at 10-11. She spoke to Mother and discussed the warrant for Mother's arrest in relation to E.M.-P.'s injury, for which Mother finally surrendered herself more than eight months after the warrant issued. *See id*. at 12-13, 39.[3] As of June 2021, sixth months prior to the date DHS

_____

[2] At the time of the involuntary termination proceeding, Mother had a pending criminal trial for charges related to the incident. *See* N.T., 8/5/22, at 38-39, 48.

[3] Mother had refused to give Jackson her address prior to her arrest for fear she would be taken into custody, and did not provide it until April 2022. *See* N.T., 8/5/22, at 24-25, 62. At the time of the hearing, Mother lived with her partner and new child in a one-bedroom apartment. *See id*. at 25-26.

filed its involuntary termination petitions, Mother's single case plan ("SCP") objectives were to attend a Women's Empowerment group and Achieving Reunification Center ("ARC") classes for parenting, housing, and employment, complete a Parenting Capacity Evaluation ("PCE"), attend supervised visits with Children virtually or in person as scheduled, receive mental health treatment, and secure appropriate housing and employment. *See id*. at 13-14. Mother's primary therapeutic objective required her to acknowledge E.M.-P.'s abuse and her role in that abuse. *See id*. at 48, 58. Mother did not receive any mental health treatment between June 2021 and May 2022, *see id*. at 35-36, and never acknowledged her part in E.M.-P.'s abuse, *see id*. at 48, 58, 86, 111.[4] From June to December 2021, Mother missed twelve of twenty-four virtual and in-person visits with Children. *See id*. at 17-24, 43.

Mother completed parenting classes in December 2020. After having been terminated from ARC classes in August 2021 for "unsuccessful parent engagement," she completed parenting classes again in May 2022. *See id*. at 27-29, 33-34. ARC terminated Mother from housing classes in November 2021. She later completed the first of two parts of that class. *See id*. at 30. Mother currently lives with her new child and the child's father in a one-

---

[4] Even with the mental health therapy that Mother said she began receiving in May 2022, she said she did not understand the basis for the termination proceedings because she had not inflicted E.M.-P.'s injuries and asserted she had done the best she could to get him to the hospital after his injury. *See* N.T., 8/5/22, at 37-38.

bedroom apartment that would not be appropriate for reunification with Children. *See id*. at 30-31. Although Mother expressed a desire to move, at the time of the termination hearing she had not taken any steps to do so. *See id*. at 62-63.

Mother did not complete financial education classes and had not completed Women's Empowerment classes at the time of the termination hearing despite having had more than one year to do so. *See id*. at 31-32, 48-49. CUA case manager Jackson rated Mother 'moderately-to-substantially' compliant with her SCP objectives at the time of the termination hearing, but minimally compliant as of the time of the filing of the involuntary termination petitions. *See id*. at 39-40. Jackson stated that Mother had not addressed the reason that brought Children into care, Children could not be currently reunified with Mother, and Children look to their current caregivers to fulfill their daily needs. *See id*. at 40-41, 58. Although Mother never progressed beyond supervised visits with Children, Jackson opined that Children would experience irreparable harm "[t]o an extent" if the court terminated Mother's parental rights. *See id*. at 41-42.

All three Children have special needs. Mother refused to authorize an Individual Education Plan ("IEP") to address K.M.'s behavioral problems when asked to do so. She also refused to allow K.M. to be evaluated for the purpose of prescribing medicine. *See id*. at 49-51. Mother also refused to permit treatment of K.M.'s dental and visual problems. *See id*. Mother did not meet

with a doctor to discuss A.M.-P.'s sleep problems; as a result, A.M.-P. never received the medication she required. ***See id***. at 52. Additionally, after E.M.-P. repeatedly announced a plan to run in front of a car and kill himself about one month before the hearing, Mother refused to permit Children's Crisis Response Center ("CCRC") to evaluate him. ***See id***. at 53, 82-84.

Katie Hee ("Hee") of the Children's Crisis Treatment Center ("CCTC"), who testified as an expert in trauma therapy, stated that E.M.-P. has post-traumatic stress disorder ("PTSD"), and a particular concern about getting in trouble. E.M.-P. said that when he peed on the floor, Father inflicted his leg injury. ***See id***. at 71-77. Hee testified that E.M.-P. stated that some mothers do not care about their children, and made a gesture of choking himself when asked about returning to live with Mother. Hee testified that E.M.-P. actively avoids discussing that topic, and prefers not to discuss his visits with Mother. ***See id***. at 78-80, 91. Hee reported that E.M.-P. is making a good adjustment to his foster mother, and appears more comfortable with her and talking about her. ***See id***. at 85-86, 89-90. In Hee's expert opinion, termination of Mother's parental rights to E.M.-P. would not cause him irreparable harm. ***See id***. at 87-88, 90-91, 94. Hee also opined that a parent's unwillingness to acknowledge her role in a child's trauma prevents the child from feeling safe and supported. ***See id***. at 94-95.

Jessica Spurgeon ("Spurgeon"), of CCTC, and the supervisor of the therapist who treats A.M.-P., who testified as an expert in trauma therapy,

stated that A.M.-P. has adjustment disorder with mixed disturbance of emotions and conduct. *See id*. at 98-103. Spurgeon testified that A.M.-P. does not talk about Mother and is emotionally triggered when she sees her. *See id*. at 106-08. Spurgeon also testified that A.M.-P. has stabilized with her new foster mothers, and has a mother-child bond with them, not with Mother, who has made no attempt to participate in A.M.-P.'s treatment. *See id*. at 108-13. In Spurgeon's expert opinion, the involuntary termination of Mother's parental rights would not cause A.M.-P. irreparable harm, especially because Mother never acknowledged her role in A.M.-P.'s trauma. *See id*. at 110-13.

Christina Tavares ("Tavares"), a child advocate social worker for the Defender Association of Philadelphia, has worked with K.M. since April 2020. *See id*. at 117-18. Tavares testified that DHS obtained the OPC in April 2020 and removed K.M. from Mother's home due to his need for an IEP, and his dental work and visual problems which Mother refused to address. *See id*. at 118-20. Tavares testified that shortly thereafter, K.M. required more intense behavioral treatment, which Mother refused to authorize. *See id*. at 121-22. Tavares also testified that when K.M. had increased need for mental health treatment the next month, a court had to persuade Mother to allow him to receive in-patient treatment, which he received for approximately eight months during which he received an autism diagnosis. *See id*. at 122-25.

Mother did not visit K.M. from June 2020 to March 2021 because, in Tavares's words, Mother "was stressed out and just couldn't handle it." *See id*. at 135.

Tavares has not seen a mother-child bond between Mother and K.M. *See id*. at 128-29. Tavares testified that K.M. is "[a] different child" in his new foster home; he no longer has tantrums or exhibits destructive behavior and has a strong bond with his foster parent, who helps him to calm himself. *See id*. at 130-31. Tavares also testified that K.M. does not mention Mother and has a parent-child bond with his foster mother, who meets his needs in a way that Mother does not. *See id*. at 132-34, 136-38.

Children's legal counsel presented the testimony of Roya Power ("Power"), a social worker. Power testified that K.M. stated that he wants to be adopted but wants to maintain a relationship with his siblings, A.M.-P. wants to stay with her foster family, which may be ready to consider adopting her, and E.M.-P. is very bound to his foster mother and wants her to adopt him, while allowing him to see his siblings. *See id*. at 144-56. Power does not believe that any of Children would suffer irreparable harm from the involuntary termination of Mother's parental rights. *See id*. at 157.

At the conclusion of the hearing, the trial court found clear and convincing evidence to support the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Regarding section 2511(a)(1), the court found that Mother failed to demonstrate an ability to perform parental duties, spend consistent time with

Children, and provide for Children's educational and medical needs. *See id*. at 175-76.[5]  Concerning section 2511(b), the court noted that although case manager Jackson perceived a bond between Mother and Children, she did not describe it as a parental bond.  Moreover, the court did not find credible and persuasive Jackson's testimony that Children would suffer irreparable harm from termination, in light of the contrary testimony by the experienced social workers who stated that Children do not have a healthy parental bond with Mother which would cause irreparable harm if terminated.  *See id*. at 179-80. The court involuntarily terminated Mother's parental rights to Children and changed their permanency goals to adoption.  *See id*. at 175-81.

Mother filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  The trial court issued a notice of its compliance with Pa.R.A.P. 1925(a), directing this Court to its findings at the hearing on the involuntary termination petitions and petitions to change Children's permanency goals to adoption.[6]

On appeal, Mother presents the following issues for our review:

1. Did the [t]rial [c]ourt err in terminating [Mother's] parental rights under 23 Pa.C.S.[A.] [s]ection[s] 2511(a)(1), 2511(a)(2), 2511(a)(5), and 2511(a)(8)?

---

[5] The court also found that the evidence established sections 2511(a)(2), (5) and (8).  *See id*. at 176-79.
[6] We note that the trial court failed to make detailed findings of fact, which makes our review more difficult.

- 10 -

2.    Did the [t]rial [c]ourt err in finding that termination of [Mother's] parental rights best served the children's developmental, physical and emotional needs under 23 Pa.C.S.[A.] [s]ection 2511(b)?

3.    Did the [t]rial [c]ourt err in changing the children's goal to adoption?

Mother's Brief at 8.

Mother's first issue asserts that the trial erred in involuntarily terminating her parental rights under 23 Pa.C.S.A. §2511(a) because clear and convincing evidence did not support that termination. We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***See In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021) (citation omitted). In applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if supported by the record. ***See Interest of S.K.L.R.***, 256 A.3d 1108, 1123 (Pa. 2021); ***see also In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021).

Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. ***See*** 23 Pa.C.S.A. §§ 2101-2938. Section 2511(a) of that Act provides grounds for involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). ***See In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010).

Here, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court's decision as to any one of the grounds under subsection 2511(a), along with subsection (b), to affirm a decree terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we review the evidence relating to sections 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (1) The parent by conduct continuing for at least six months immediately preceding the petition has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

When a parent has demonstrated a settled purpose to relinquish a parental claim to a child or refused or failed to perform parental duties under section 2511(a)(1), the court must consider: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) the effect of termination of parental rights on the child pursuant to 23 Pa.C.S.A. § 2511(b). ***See In re Termination of C.W.S.M.***, 839 A.2d 410, 415 (Pa. Super. 2010). We have recognized that although there is no simple definition of parental duty, it is:

> best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance. . ..
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [her]self to take and maintain a place of importance in the child's life. . ..
>
> ***Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.***

***In re Z.P.***, 994 A.2d at 1118-19 (citations omitted) (emphasis in original).

With respect to section 2511(a)(1), Mother asserts that she has demonstrated the intent, willingness, and capacity to care for her children. She states that Children enjoy her visits and brings activities to their visits. She states that she has completed parenting classes, obtained employment, and attended mental health treatment, and that Children would suffer

irreparable harm from the termination of her parental rights. ***See*** Mother's Brief at 20-21.

The trial court stated that in multiple instances Mother failed to demonstrate an ability to perform, and failed to perform, parental duties. The court found that Mother failed to spend consistent time with Children, and failed to provide for their educational and medical needs throughout the time prior to the filing of the petition. ***See*** N.T., 8/5/22, at 176.

Following our review, we agree with the trial court that there was clear and convincing evidence for termination under section 2511(a)(1). Mother missed twelve of twenty-four virtual and in-person visits with Children in just the six months before the filing of the termination petition. ***See id***. at 23-24, 32. Further, Mother did not visit K.M. even once from June 2020 to March 2021 because, in social worker Tavares's words, Mother "was stressed out and just couldn't handle it." ***See id***. at 135.

Additionally, on multiple, important occasions when Mother would have had to do very little to provide for Children's serious, immediate needs, she refused to do so, for example, (1) when K.M. needed an IEP, Mother refused to authorize it; ***see id***. at 49-51; (2) when K.M. required evaluation for medication, as well as dental treatment and vision treatment, Mother refused to authorize any of those evaluations or treatments, ***see id***.; (3) when A.M.-P. needed medication for sleep problems, Mother failed to meet with a doctor and thereby deprived A.M.-P. of the medication she required, ***see id***. at 52;

and (4) when E.M.-P. repeatedly announced a plan to kill himself, Mother refused to permit the CCRC to evaluate him, *see id*. at 53, 82-84. These multiple instances of Mother's failure to perform even minimal acts when Children had compelling needs constituted clear violations of Mother's failure to perform her parental duties to meet Children's needs. *See In re Z.P.*, 994 A.2d at 1118-19.

Mother's continuing failure to participate in mental health treatment[7] to address the reason the Children came into care, which represented a barrier to the Children's treatment and their connection to Mother, lends further support to the trial court's finding of Mother's dereliction of parental responsibility under section 2511(a)(1). *See* N.T., 8/5/22, at 94-95, 110-13. Mother also took no affirmative steps to find appropriate housing and at the time of the hearing lived in a one-bedroom apartment with her partner and their newborn child that could not accommodate Children. *See id*. at 30-31, 62-63.

Mother's explanation for her conduct does not support a different result. Mother failed to acknowledge her part in E.M.-P.'s abuse, which also traumatized A.M.-P. Despite waiting more than twenty-four hours to seek treatment for E.M.-P.'s broken femur, which produced pain so severe it

---

[7] Contrary to Mother's assertions, she presented no evidence that she received any mental health treatment between June 2021 and May 2022. *See* N.T., 8/5/22, at 35-36.

required the administration of morphine to the two-year-old, Mother claimed that she had done the best she could to get E.M.-P. to the hospital. *See id*. at 37-38. Moreover, although Mother has visited Children post-abandonment, the experts' and social worker's testimony clearly showed that Children are all happy with their foster families, have improved in those placements, want to be adopted, and would not be irreparably harmed by the termination of Mother's parental rights. *See id*. at 87-88, 90-91, 94, 110-13, 144-57. The trial court did not err in finding that the evidence established the application of section 2311(a)(1) because Mother failed to perform her parental duties to Children. *See In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Mother's second issue implicates section 2511(b), the best interests of the Children. Regarding section 2511(b), we consider whether termination of parental rights will best serve the Children's developmental, physical, and emotional needs and welfare. *See In re Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id*.

The court is not required to use expert testimony when conducting a bonding analysis. Social workers and caseworkers can offer evaluations as well. *See id*. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the

particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). Further,

> in addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

***In re A.S.***, 11 A.3d 473, 483 (Pa. Super. 2010). "Above all else . . . adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." ***In re Z.P.***, 994 A.2d at 1121 (internal citation omitted). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856.

Mother asserts that Jackson, the CUA case manager, testified that the Children had a bond with Mother and that they would suffer irreparable harm if her parental rights were terminated.

The trial court acknowledged that Jackson testified that Mother had a bond with Children, although Jackson did not describe it as a parental bond. ***See*** N.T., 8/5/22, at 179. However, the court found Jackson's testimony that Children would suffer irreparable harm from termination lacked credibility or persuasiveness, in light not only of the testimony of the two child trauma experts, but of a social worker who assessed Children a few months before the hearing and determined that Children do not have a parental bond with

- 17 -

Mother, even if they have some type of bond. *See id*. at 179-80. The court further stated that Mother demonstrated her failure to serve the Children's needs by assuring that they received proper medical care, supporting the conclusion that involuntary termination would not cause them irreparable harm. *See id*. at 180.

Following our review, we discern no abuse of discretion by the trial court in finding clear and convincing evidence for termination under section 2511(b). The trauma experts and the social worker testified that Children's behavior and sense of security has improved measurably since their placements with potential adoptive families and all of them want to be adopted. *See id*. at 85-91, 94, 110-13, 130-38, 146-57. Although the Children felt some sort of bond to Mother, it was not a parental bond. The court thus did not abuse its discretion in finding that the evidence satisfied section 2511(b). *See In re B., N.M.*, 856 A.2d at 856.

In her final issue, Mother argues that the trial court abused its discretion by changing Children's permanency goals from reunification to adoption where DHS failed to meet its burden of proof that goal changes would best suit Children's needs and welfare. Given our disposition affirming the termination decrees, Mother's appeals from the goal change orders are moot. Therefore, we dismiss her appeals from the goal change orders. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is

moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citation omitted).

Termination decrees affirmed. Appeals from the goal change orders dismissed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2023